JAMES B. JOHNSON, Appellant, v. UNITED RAILWAYS COMPANY OF ST. LOUIS, et al.

Division One, April 12, 1910.

1. **APPEAL: Motions to Dismiss and Strike Off: Final Judgment.** Where a demurrer to plaintiff's third amended petition was sustained as to a certain group of defendants and in the same order a former order of publication as to another group was quashed on the ground that, though non-residents, the property sought to be reached had its situs elsewhere and the court therefore was without jurisdiction, neither a motion by the first group to dismiss the appeal, nor one by the second group

to strike the cause from the docket, on the ground that "there is no final judgment as to all the defendants," will be sustained. Under the statutes the judgment was final as to all the defendants.

2. **INJUNCTION: Sound Discretion: Rights of Defendants and the Public.** Injunction is the strong arm of the court, and to render its operation benign and useful should be exercised with great judicial discretion, and only when necessity requires it. It is not only the rights of plaintiff which are to be considered, but those of defendants, and of all silent persons in like situation with defendants, and if the life and efficiency of a great public service corporation are involved then the interest and conveniences of the public are also to be considered.

3. ——: ——: **To Rescind Corporate Agreement to Sell Assets: Status Quo Ante: Disproportionate Injury.** Where the suit is brought by a single stockholder (whose holdings are comparatively small, and who bought his stock in the market after the agreement was made) to rescind an agreement by which one public service corporation and all its other stockholders agreed to turn over its properties and franchises to another corporation, and thereby provide a way for paying its pressing debts, which the bill fails to disclose it had any other means of paying, the writ should not issue, if it is apparent from the bill (1) that the negotiation has so far progressed that it will be impossible for any judicial decree to restore the *status quo ante* of the insolvent company, or (2) that the injury that would result to others would be disproportionate to any reasonably-to-be-expected benefits that could result to plaintiff under the application of just principles of equity.

4. ——: ——: ——: **Already Executed.** Aside from this, it being evident that the amended bill is framed on the theory that the agreement has already been executed, it is not clear that the remedy by injunction should be employed, even though the manifest injury to others be overlooked.

5. **RESCISSION: Agreement to Sell Assets: Suit by Minority Stockholders.** Where minority stockholders do not consent to the sale of the corporate properties, and the sale has already gone into effect, rescission will not be decreed where it will be productive of more injury than would result from a refusal of it, or where the asking stockholder stood by until the rights of strangers, not parties to the suit, and the public generally have attached. Furthermore, when a person becomes the owner of shares of a corporation, his right to the equitable relief of rescission of a corporate sale is modified by the fact that he holds small portions of the stock; and if he has a remedy at law for

his injuries resulting from wrongful conduct whereby his stock is converted or its market value taken from him an equity court will not decree rescission.

6. ——: ——: ——: **Accounting.** A stockholder cannot in the same bill repudiate the sale and yet take under it. If the purpose of his bill is to have rescinded a corporate contract of sale, by which all the assets of the corporation have been transferred to another, and to have rehabilitated and built up, the corporation pulled down, and rescission cannot on equitable principles be decreed, he cannot have an accounting for his stock wrongfully converted. If the value of his stock has been wrongfully converted without his consent, he has his remedy for damages in an action at law.

7. **ORDER OF PUBLICATION QUASHED: Demurrer Sustained.** Where the demurrer of certain defendants to the bill is properly sustained, on the ground that it does not state a cause of action, it is no longer an open question as to whether the court erred in quashing an order of publication by which other defendants were brought in.

Appeal from St. Louis City Circuit Court.—*Hon. Jas. E. Withrow,* Judge.

AFFIRMED.

*Jno. A. Gilliam* for appellant.

(1) The quashing of the order of publication was error. The St. Louis Transit Company and the United Railways Company of St. Louis were both corporations of the State of Missouri, and this State was primarily and necessarily the State in which the ownership and disposition of that stock should be litigated and the courts of this State alone could adjudicate the ultimate right thereto, and this was the only State that could fully enforce its decrees therein. Armour Bros. v. Smith, 113 Mo. 12; Stout v. Stout, 77 Ind. 539; Lippincott v. Carriage Co., 34 Fed. 575; O'Connell v. Taney, 16 Colo. 353; Abbott v. Goodall, 100 Me. 231; Fahrig v. Brewing Co., 113 Ill. App. 525; Patterson v. Railroad, 76 Conn. 635; Crichton v. Webb Press Co., 36 So. (La.) 931. (2) While in the case at bar, by reason

of the unauthorized acts of the directors and some of
the stockholders, the corporation was not formally dis-
solved, and is still in formal existence, yet its business
was all closed out on October 31, 1904, by an alleged
surrender of its lease and turning over all its assets
either to its own stockholders by a gift of two shares of
United Railways stock for each five shares of Transit
stock held by them, or turning over to Brown Bros. &
Co. on an alleged sale, or to the United Railways Co.
All the Transit Co. debts were not paid. Hence plain-
tiff had a perfect right on that ground alone to refuse
to take two shares of United Railways common stock
for five shares of Transit stock, because he would im-
mediately be liable to a suit by corporate creditors for
the stock so received. Cook on Corp., sec. 641 (5 Ed.),
p. 1436; R. S. 1899, sec. 1187. There were over 9,000
shares not voted at the so-called stockholders' meeting,
and hundreds of thousands in debts were not paid.
Dividends paid to stockholders out of assets are illegal
as to corporate creditors whether paid before or after
dissolution. Cook on Corp. (5 Ed.), sec. 546 and 642,
p. 1445. As no provision whatever was made in the
so-called tripartite agreement to pay negligence credi-
tors, otherwise cripples, widows and orphans injured
by the operations of the Transit Company, there was
certainly no obligation on the plaintiff as a stockholder
to accept stock in the United Railways Company for his
stock in the Transit Company, and then be subject the
next day to a suit for its value. Lamar v. Allison, 101
Ga. 270; Railroad v. Howard, 7 Wall. (74 U. S.) 392;
Hastings v. Drew, 76 N. Y. 9; Gratz v. Redd, 4 B. Mon.
(Ky.) 178; Vance v. McNabb, 92 Tenn. 47; Grant v.
Southern Contract Co., 104 Ky. 781; Gill v. Balis, 72
Mo. 424; Alexander v. Relfe, 74 Mo. 495; Heman v.
Britton, 88 Mo. 549; Hagemann v. Railroads, 202 Mo.
249; Marr v. Bank, 4 Cold. (Tenn.) 471; Missouri Lead
M. & S. Co. v. Reinhard, 114 Mo. 218; Railroad v. Bee,
48 Cal. 398; Bridge Co. v. Fowler, 55 Kas. 17; Railroad

v. Evans, 66 Fed. 809. Further, one of the conditions of the offer to plaintiff and other stockholders, which plaintiff refused, and declares in his petition was *ultra vires*, was that the United Railways stock he was to get was to be in a voting trust for five years under the absolute control of Brown Bros. & Co. Surely the law has never yet gone so far as to compel him to take stock in another corporation, in which he is forbidden to have any sort of control for five years. Barrie v. Railroad, 138 Mo. App. 557. The defendants, who are mostly directors, could not purchase the assets of the Transit Co. Bosworth v. Allen, 168 N. Y. 157; Cook on Corp. (5 Ed.), sec. 648; 120 Fed. 440; Port v. Russell, 36 Ind. 60; Rutland Co. v. Bates, 68 Ver. 579; Miner v. Ice Co., 93 Mich. 97; Fougeray v. Cord, 50 N. J. Eq. 185. Equity throws the burden on the director to show that purchase was proper, fair, made in good faith, and without any undue advantage of the corporation. Ryan v. Williams, 100 Fed. 172; Coombs v. Barker, 79 Pac. (Mont.) 1; Brewing Co. v. Flanner, 44 La. Ann. 22; Booth v. Land Co., 59 Atl. 767; 10 Cyc. 807-814; Jones v. Missouri-Edison Co., 144 Fed. 765. Complainant may pray for complete setting aside of transfer or for such other relief as equity under the circumstances can grant, and equity will grant him the relief to which he is entitled. Jones v. Missouri-Edison Co., 144 Fed. 765; Liese v. Meyer, 143 Mo. 547. The minority are entitled to a public sale. Cook on Corp. (5 Ed.), sec. 662, p. 1531 and sec. 671; Chicago Cab Co. v. Yerkes, 141 Ill. 320; Mason v. Pewabic Co., 133 U. S. 50; Keen v. Johnson, 9 N. J. Eq. 401; Ervin v. Oregon Nav. Co., 27 Fed. 625; Railroad v. Railroad, 13 R. I. 260; Morris v. Elyton Co., 125 Ala. 263; Forrester v. Boston Co., 21 Mont. 544; Feld v. Roanoke Co., 123 Mo. 603; Elyton Land Co. v. Dowdell, 113 Ala. 177; Carter v. Producer's Co., 164 Pa. St. 463.

*Boyle & Priest* and *T. E. Francis* for respondents.

(1) The appeal should be dismissed for the reason that no final judgment has been rendered disposing of all the parties to the cause. Eighteen of the thirty defendants demurred, and upon the demurrer being sustained, final judgment was rendered for them, but no judgment in favor of the other defendants was rendered, and the cause is still pending in the court below as to them. Rock Island Imp. Co. v. Marr, 168 Mo. 252; Baker v. St. Louis, 189 Mo. 375. (2) The court did not err in quashing the order of publication against the non-resident defendants. The only relief that could be granted as to said defendants, under the averments of the bill, would be to order an accounting, and any judgment that might be rendered thereon would necessarily be *in personam*. In such a case, jurisdiction cannot be obtained by publication. Beyer v. Trust Co., 63 Mo. App. 521; Wilson v. Railroad, 108 Mo. 588; Moss v. Fitch, 212 Mo. 484; Pennoyer v. Neff, 95 U. S. 714. (3) Plaintiff cannot maintain this suit, because he had not registered his stock nor obtained recognition from the corporation as a stockholder, at the time it was filed. Brown v. Railroad, 53 Fed. 889; Hodge v. U. S. Steel Corp., 53 Atl. 601. (4) Plaintiff cannot maintain the action because he was guilty of laches. Tanner v. Railroad, 180 Mo. 18 Hanchett v. Blair, 100 Fed. 827; Field v. Roanoke Inv. Co., 123 Mo. 603; Sheldon Hat Co. v. Eixkemeyer Co., 90 N. Y. 611; 1 Thompson on Corp., sec. 80; 4 Thompson on Corp., sec. 4534; Zabriskie v. Railroad, 23 How. (U. S.) 398; 5 Notes U. S. Rep. 1000; Commonwealth v. Cullen, 53 Am. Dec. 467 (note); Stokes v. Detrick, 76 Md. 226; Tash v. Adams, 10 Cush. 252. (5) (a) A suit by a stockholder of a corporation to set aside a transfer of the corporation's property is essentially a suit on behalf of the corporation. 26 Am. & Eng. Ency. Law, p. 972; Exeter v. Sawyer, 146 Mo. 324. (b) It necessarily follows that where the corporation itself has no

valid cause of action, a stockholder cannot maintain any such suit in its behalf. 26 Am. & Eng. Ency Law, p. 972; Waymire v. Railroad, 112 Cal. 646; Miller v. Magazine Co., 10 Misc. (N. Y.) 311; Hart v. Railroad, 89 Hun (N. Y.) 316; Hutchison v. Simpson, 92 N. Y. App. Div. 382. (c) Where suit is brought for the rescission of a contract, the plaintiff has no cause of action unless he tenders back whatever of value he has received and places the other contracting party *in statu quo*. Buford v. Packet Co., 69 Mo. 611; Robinson v. Sipple, 129 Mo. 1. c. 220; Melton v. Smith, 65 Mo. 315; Donovan v. McDermott, 108 Mo. App. 533; 12 Enc. Pl. & Pr., 831. (d) The Transit Company would have no standing in court to rescind the tripartite agreement and to recover back the property it had disposed of in pursuance thereof, unless it first restored the *status quo* by returning to the other contracting parties that which they paid out and assumed as consideration for the transfer of said property. And plaintiff in suing for Transit Company stands in precisely the same position as that company would, were it the plaintiff. The petition does not, therefore, state a cause of action, inasmuch as it does not allege or show any offer, willingness or ability to restore the *status quo* either by plaintiff or the Transit Company. Buford v. Packing Co., 69 Mo. 611. Authorities cited under subdivision c, supra. (6) If facts were pleaded that would justify a decree of rescission, such rescission would not be granted, because it would be productive of more injury than would result from a refusal of it. Tanner v. Railroad, 180 Mo. 1; Bailey v. Culver, 84 Mo. 540; Railroad v. Payne, 49 Fed. 114; Swift v. Jenks, 19 Fed. 643; Morris v. Pruden, 20 N. J. Eq. 530; Railroad v. Strauss, 37 Md. 237; Sheldon v. Rockwell, 9 Wis. 166; Cobb v. Smith, 16 Wis. 166; Gray v. O. & P. Co., 1 Grant's Cas. 412; Van Rance v. College, 4 Hun 620; Meredith v. Sayer, 32 N. J. Eq. 557; Southard v. Canal Co., 1 N. J. Eq. 518; Sprague v. Rhodes, 4 R. I. 301; Wood v. Sutcliffe,

8 Eng. L. & E. 217   (7)   In the tripartite agreement, set out in the bill, Transit Company admits that it had no way of paying a shortly maturing indebtedness of $6,711,000, most of which was secured by a pledge of the securities sold to Syndicate, except by the sale of .those securities as provided in that agreement. This admission of inability to pay this huge sum was a confession of insolvency, and it is not alleged in the bill to be untrue.   Neither is it alleged that this sale was brought about through clandestine methods, nor that any other person offered to or would have paid more for the securities than Syndicate did, nor that any other person was prohibited from making an offer for them.   Under these facts, the sale of said securities was not fraudulent in law.

LAMM, P. J.—Suit in equity by a stockholder of the St. Louis Transit Company on behalf of himself (and any others who, willing to share the expense, may wish to join) for rescission of certain corporate acts and contracts and for an auxiliary injunction. Cast on demurrer to his third amended bill, plaintiff appeals.

The grounds of the demurrer were that the bill did not state facts sufficient to constitute a cause of action and was multifarious.   The demurrer was offered on behalf of certain corporate defendants and individuals actually served with process.   There was a group of defendants made parties to the third amended bill and not summoned.   As to them, an affidavit of non-residence was made and an order of publication issued which was quashed and set aside on their motion, they appearing specially for that .purpose only. In brief, the grounds of that motion were that the suit was not of the character authorizing publication against them under section 575, Revised Statutes 1899, or any other statute.   That the bill does not show that the property in their hands is within the State of Missouri.   It shows that they are charged with making

certain commissions and profits, which commissions and profits are the only property alleged to be in their possession; all the other property in question being shown to be in the possession of the defendants, the United Railways Company; that such profits are personal property having its situs at the residence of defendants; and that the order of publication, improvidently made, confers no jurisdiction over defendants or any of them so as to authorize any judgment whatever against them. This motion was sustained with the demurrer, plaintiff assigning error on both rulings.

The group of defendants served with summons file a motion here to dismiss the appeal. The other group (the one sought to be brought in by publication) file a motion to strike the cause from the docket. The first motion is predicated of the notion that there is no final judgment "as to all of the defendants, and plaintiff's appeal is, therefore, premature." The grounds of the last motion are, first, because there is no final judgment against movents; and, second, no order below allowing an appeal as against them.

The questions here are three: *First,* were the motions to dismiss and strike from the docket well taken? *Second,* was there error in sustaining the demurrer? *Third,* or in sustaining the motion to quash the order of publication?

I. *Of the motions to dismiss and strike off.* They are supported in briefs of like tenor; therefore, call for a common exposition. The record shows that on November 12, 1906, the following entry was spread of record: "The court having heard and duly considered the demurrer to the amended petition, and the motion to quash the order of publication as to certain defendants, . . . doth order that the same be and are hereby sustained." On November 19th, plaintiff has his bill of exceptions settled, allowed, signed and filed, duly saving an exception to the ruling of the court on the motion to quash. November 22d, at the same term,

a *nunc pro tunc* entry was made correcting the entry of the twelfth. In effect, it left it stand as a ruling on the motion to quash, that is, it says nothing about it, but narrates that by inadvertence the entry of November 12th does not correctly set forth the order and judgment, that the cause came on to be heard on the demurrer of certain defendants (naming them), that the court is now sufficiently advised in the premises and "doth order, adjudge and decree that said demurrer be and the same is hereby sustained." It goes on to find that this is the third amended petition and that two other amended petitions had been "adjudged insufficient in whole upon demurrer." On such premise, it adjudges plaintiff pay treble costs, take nothing by his writ, that said defendants go hence without day, and that the bill (quoting) "be dismissed out of court for want of equity, *and that this decree be treated and regarded and stand in all respects as the final decree in this cause,*" etc. Following such *nunc pro tunc* entry, plaintiff filed his affidavit of appeal and one was allowed to him.

It is on such a record defendants contend there is no final disposition of the cause as to the group of nonresidents; and, they say, absent such final disposition, the cause is still pending below as to them; *ergo,* the appeal is premature.

But we are unable to agree with learned counsel. We think it clear this plaintiff had reached the end of his row below and that a sufficient final disposition of the cause had been made as to all defendants. For instance: As to the group brought in by service he could plead no further; for the statute put up the bars at that point and directed final judgment. [R. S. 1899, sec. 623.] As to the group not brought in it would have been a vain and futile thing, without fruit, for him to ask for another order of publication. This because the motion to quash was not directed to any irregularity of form or other remediable defect in the order of pub-

lication or in its execution, but struck straight at the heart of the matter, *viz.*, the right to any order of publication whatever, and the court, responding, held that group of defendants not amenable to constructive service. Counsel argue that plaintiff might have sued out an alias summons. But it would have been just as vain and useless to ask for a summons against them, for on this record they must be taken as non-residents. Having obtained a ruling in their favor as non-residents they are estopped to deny they were non-residents and cannot be permitted to say a summons would have been effective. So, it would have been unjust to require plaintiff to dismiss as to them; for he claimed the right to make them parties and recover against them, and, had he dismissed, that right was gone. That group of defendants were not entitled to a judgment against him; for they were not in court for such purpose and asked no such judgment. So, under our statutory scheme, a "motion" calls for an "order" only. [R. S. 1899, sec. 768.] Furthermore, the plaintiff was not entitled to a final judgment against himself on that motion, because there can be but one final judgment in a cause. [R. S. 1899, sec. 694, 773.] In this case there was a final judgment entered on the demurrer. That was the appointed and statutory time and place for it. [R. S. 1899, sec. 623.]

The premises considered, the learned trial judge indicated the right view of it when he said "That this decree be treated and regarded and stand in *all* respects as the final decree in this cause."

In giving effect to statutes ordaining that there should be only one final judgment in a cause, we have ruled that final disposition must be made below as to all the defendants so that when the cause comes up it comes here as an entirety and not be left partly below. Defendants rely on cases of that character. [Rock Island Implement Co. v. Marr, 168 Mo. 252; Baker v. St. Louis,

227 Sup—28

189 Mo. 375.] Those were cases in which all the defendants were actually served with process. Nothing we have said militates against anything resolved in those cases. Here there was a final disposition as to those defendants brought in as well as those kept out. We know of no rule of code practice requiring the final judgment itself to show the final disposition made of the case as to each and every defendant. The record may show, as here, that the case was disposed of as to some by interlocutory rulings on motions. Nor is it the policy of any benign system of laws to force a litigant to give up any substantive right (for instance, by dismissing as to some defendants) in order that he may appeal—*contra,* the road up should be left open and as free from obstacles as a reasonable construction of the statutes will permit, the very object of an appeal being to preserve all such substantive rights to him. If we ruled as defendants' counsel argue we would hold that this plaintiff, under circumstances present, could neither go on below nor come up by appeal—a most lame and impotent conclusion arresting his cause midway and practically denying him his day in court.

The motions to dismiss and to strike from the docket are overruled.

II. *Of the demurrer.* Plaintiff's counsel put his own estimate on his third amended bill by stating the object and general nature of it in the order of publication, thus: "To set aside the agreements made by said United Railways Company with the St. Louis Transit Company and the Brown Brothers & Company syndicate in September and October, 1904, to set aside the surrender and cancellation of the lease of the United Railways Company to said St. Louis Transit Company of date September 30, 1899. To set aside the sale of the bonds, stocks and assets of the St. Louis Transit Company to the United Railways Company and Brown Brothers & Company syndicate, to restore the St. Louis Transit Company to the possession of the power houses,

tracks, cars, lands and equipments leased to them by said United Railways Company, located in the city of St. Louis, Missouri, and county of St. Louis, Missouri, to require an accounting from all the defendants of all the moneys, assets, stocks and bonds received by them from the St. Louis Transit Company, and for an injunction preventing defendants from issuing further encumbrances upon the property leased by the St. Louis Transit Company from the United Railways Company, and if such full relief cannot be granted, that plaintiff and those who may join herein with him and the St. Louis Transit Company be given such relief as to the court may seem proper, and that the court shall follow the property of the St. Louis Transit Company and decree to plaintiff and those who may join with him a share in profits arising from its use and the operations of said United Railways Company in the same ratio that they would have shared if the said sale of assets and surrender of lease had not been made, and such other and further relief as may be just and proper.''

Plaintiff's bill is elaborate and too long to reproduce *totidem verbis*. However, the demurrer seeks at least the substance of its allegations.

Throughout the bill the word ''Syndicate'' is used. We gather that ''Syndicate,'' within the purview of the bill and the various agreements and acts assailed, means an aggregation of individual defendants having ''managers,'' at least one of which was Brown Brothers & Company—the membership of Syndicate being elastic and opening to take in new members or let out old from time to time.

Certain domestic corporations doing business in the city of St. Louis are made defendants, *viz.*, United Railways Company, Transit Company (street railway companies) and Mercantile Trust Company. Another corporate defendant is the National Bank of Commerce in St. Louis. A group of ten individual defendants are

directors of Transit Company. The same group, with one exception, were directors of the United Railways Company—the exception, Mr. Conrades, is also made a party defendant. Another group of defendants were the members of a firm, Brown Brothers & Company. The latter, with one or two exceptions, were not served with process, but were the non-residents against whom the order of publication issued. A Mr. Delano is a party defendant. He was one of the directors of Railways Company and of Transit Company and a member of the firm of Brown Brothers & Company.

As an excuse for the absence of a request for corporate action in bringing a suit to redress the wrongs complained of, it is alleged that the various individuals comprising Brown Brothers firm and the directorate of the two street railway companies had conspired together and with certain other individuals and corporate defendants to do and had participated in doing the wrongs complained of and it would have been vain and useless to have asked Transit Company to sue its own directors, or United Railways Company and its directors or the firm of Brown Brothers & Company, or to have sued the other individuals defendants or the Trust Company, or the Bank of Commerce; because, among them all, they had managed so that all the assets of Transit Company had been placed in the hands of defendants and it (quoting) "had been reduced to a mere helpless shell, without assets, business, money, property or power to make money," so that plaintiff, as an individual stockholder, had to take the bull by the horns and sue in his own proper person.

In substance, it is charged that on September 1, 1904, Transit Company was a solvent and going concern with a profitable and rapidly increasing business as a street railway company in St. Louis, the owner of a valuable lease for a long term, to-wit, from September 30, 1899, to April 1, 1939, on 420 miles of street railway tracks in the city and county of St. Louis with

switches, power houses, dynamos, wires, cars and ap-
purtenances—said lease being made to it by defendant
the United Railways Company as lessor and owner—
and was operating said railway under the laws of this
State, the ordinances of said city and said lease, with-
out default in performance of its terms and conditions
up to that date.  That in and about the performance
of the conditions of the lease providing for extensions,
equipment, repairs and betterments, Transit Company
had expended $10,000,000.  In and about operating ex-
penses, taxes, interest on bonds of Railways Company
and on underlying bonds of companies absorbed by said
Railways Company and as dividends on preferred stock
of said Railways Company, Transit Company had ex-
pended $24,000,000.  On September 1, 1904, Transit
Company was, and now is justly, also the owner of
securities amounting to about $15,000,000, said securi-
ties being preferred and common stock of the Railways
Company and first general mortgage 4% bonds of that
company.  On that date, also, creditors of Transit Com-
pany had an equitable right against the original stock-
holders for unpaid stock subscriptions of about $64 per
share; that Transit Company claimed to have a capital
stock of $20,000,000, but only 172,613 shares of the par
value of $100 per share have been issued; that Rail-
ways Company "has always been controlled" by the
firm of Brown Brothers & Company, and that firm and
the defendants "have always controlled" Transit Com-
pany; that by its said expenditures said leased and op-
erated lines and equipment have been so improved,
operating expenses reduced, traffic increased and good
will built up that it was "manifest" that great profit
would accrue to the stockholders of Transit Company
during the remainder of the lease term, "a conserva-
tive estimate of such anticipated profit being about
$59,000,000."

The bill next charges a conspiracy and confeder-
ating between all the defendants, each joining and

participating therein, to obtain possession and control of all the assets of Transit Company, in order to make an unlawful commission of $700,000, and a profit of $6,000,000 or more, and to get possession of the leasehold and plant, franchise and contracts of Transit Company, and to defeat, cheat and defraud "the other stockholders" and the creditors of Transit Company, and to secure the surrender and cancellation of its lease from Railways Company, and "have proceeded and are proceeding" to pass resolutions in the board of directors of Transit Company for a sale of all its assets by virtue of an agreement devised by them.

The bill then sets out *in haec verba* a tripartite agreement between Railways Company, Transit Company and Brown Brothers & Company—the latter signing as "Syndicate Managers." Said agreement is dated September 27, 1904. Referring to the lease from Railways Company to Transit Company it narrates that Transit Company, in carrying out the lease by making *improvements and betterments*, contracted note and bonded indebtedness, *viz.*, $5,776,000 of collateral trust notes due November 1, 1904, which notes are secured by a deposit of securities with the Mercantile Trust Company under a "collateral trust agreement" of date November 30, 1901. Said securities so deposited are 4% mortgage bonds of Railways Company and 5% preferred stock of the Railways Company, aggregating in value $7,770,500; and that Transit Company also owes $8,000,000 of gold bonds, 5-20's, secured by an "indenture of trust" between it and said Trust Company dated on the 17th day of June, 1903, which bonds are secured by a pledge of the bonds and stock deposited under the said "collateral trust agreement," subject thereto, and a further deposit of $3,329,700, par value, of preferred stock of Railways Company, and $7,261,300, par value, of the common stock of the said Railways Company, and is further secured by a mortgage upon its leasehold from Railways Company, to-

gether with a guaranty of said Railways Company.
(Note.—It will be observed that said $13,776,000 collateral trust notes and gold bonds owing by Transit
Company are secured by a pledge of all the securities
owned by Transit Company consisting of common and
preferred stock and first general mortgage bonds of
Railways Company.)

The agreement also narrates that Transit Company on August 31, 1904, had a further "specific indebtedness" of $1,665,155.17, which the estimated earnings of 1904 will reduce to $935,000; that it is unable to
meet its said collateral trust notes due November 1,
1904, and to pay the "specific indebtedness" aforesaid
except it sell said collaterals deposited with said Trust
Company; that said collaterals cannot be disposed of
without procuring a release from said pledges and from
a right of substitution existing in Railways Company
by reason of the terms of its guaranty and the trust
instrument; that in order to procure such release and
to pay its indebtedness it proposes to issue $10,000,000
of gold bonds, 5-20's, to be called "improvement
bonds," to be secured by the mortgage of Railways
Company upon all its property subject only to the lien
of existing mortgages. Having recited so much, the
agreement continues by dividing itself into four articles, viz.:

Article one provides that Transit Company and
Railways Company agree that Transit Company, when
requested by Railways Company, will surrender its
lease and transfer to Railways Company possession of
the demised property together with its cash, bills receivable and other credits upon conditions named—
Railways Company, at the same time, to release Transit Company from liability under any terms or covenants of its lease. Transit Company is to cause to be
cancelled the $8,000,000 in bonds pledged as collateral
with the Trust Company and obligates itself to cause
the holders of said bonds to exchange the same at par

for a like amount of "improvement bonds" to be guaranteed, as said, by Railways Company. Transit Company is to enter into an agreement with Syndicate for the sale of said bonds and stocks held in pledge by the Trust Company, together with the $2,000,000 of the proposed improvement bonds remaining after the proposed exchange; that in and by such sale to Syndicate, Transit Company must provide that $7,000,000 of preferred stock of Railways Company be deposited to the use and benefit of Railways Company, and Railways Company agreed, subject to the approval of a majority of its stockholders, to guarantee the $10,000,000 of proposed improvement bonds and to secure its guaranty by a deed of trust on all its properties subject only to existing mortgage lien.

By article two Transit Company agrees to sell the $2,000,000 remaining "improvement bonds" to Syndicate for $1,700,000, and to sell the preferred and common stock of Railways Company and the four per cent mortgage bonds of Railways Company, pledged by it to the Trust Company as aforesaid, to Syndicate for $5,300,000, payment of $6,700,000 to be made in accordance with a contract between the Trust Company "as syndicate manager and as trustee" and Transit Company of date September 9, 1904—the balance of $289,000 to be paid upon the order of Transit Company. Syndicate agreed to pay said amount and to cause $7,000,000 of the preferred stock of Railways Company to be deposited with a trustee for the use of Railways Company under terms and covenants hereinafter made between it and Railways Company.

By article three it was agreed between Railways Company and Syndicate that Railways Company had a certain amount of its own common stock in its treasury of the par value of $7,652,500. In consideration of the purchase made by Syndicate from Transit Company and the agreement to deposit with the National Bank of Commerce as trustee for Railways Company $7,000,-

000 of its own preferred stock, and the agreement of Syndicate to offer to procure for Railways Company shares of stock of Transit Company, Railways Company agrees to sell and to issue to Syndicate the said unappropriated stock in its treasury and further agrees to demand of Transit Company the surrender of its leasehold and to itself enter upon the premises and the operation of said property and assume the proposed issue of $10,000,000 improvement bonds and all debts then contracted for labor, materials and supplies rendered or furnished to Transit Company and Syndicate agrees with Railways Company to make the purchase provided by article two and to make the deposit of $7,000,000 of preferred stock with the Bank of Commerce, which said stock, when deposited with the bank as trustee, shall be sold by the trustee for the benefit of Railways Company at prices and terms and in amounts named by the latter. The remaining clause of article three is as follows: "Syndicate further agrees that of the common stock of Railways so purchased as aforesaid from Railways Company, it will offer to the shareholders of Transit Company, until the 18th day of October, 1904, voting Trust Certificates, issued under and by virtue of such a Voting Trust Agreement as Syndicate may organize and make, representing two shares of the said common stock for five shares of the Transit Company stock, provided said shareholders of Transit Company shall deposit their stock under terms and conditions prescribed by Syndicate for the purpose of such exchange, and, upon the basis aforesaid, with The National Bank of Commerce in St. Louis, as agent for Syndicate, on or before said 18th day of October, 1904; and such Transit shares as shall be so exchanged shall be and become the property of Railways Company, and be transferred to its treasury. All shares of Railways Company's common stock not so exchanged for Transit stock within said period shall be and remain thereafter the property of Syndi-

cate. Syndicate, however, of its own volition, but without any obligation so to do, may thereafter continue to exchange said stock upon said basis, and, should it do so, whatever shares of Transit Company stock Syndicate acquires by such exchange shall become the property of Railways Company.''

By article four it was provided that the provisions of the agreement shall not be construed as inuring to the benefit of any person or corporation whose names are not subscribed to the agreement and the whole contract was conditioned upon the shareholders of Transit Company authorizing the issue of $10,000,000 improvement bonds at a meeting to be called October 19, 1904, and the underwriting and securing of those bonds by Railways Company.

The pleader next charges that certain individual defendants (who owned certain blocks of Transit Company stock) participated in Syndicate's purchase of the assets of Transit Company in certain amounts, and that the votes of certain directors so participating were necessary to carry the tripartite agreement through in Transit Company and Railways Company; that if the tripartite agreement is sustained, by the surrender of the unexpired term of the leasehold of thirty-four and one-half years (which had a yearly value of $600,000) plaintiff's damages will exceed $19,000; that the scheme was devised for the personal benefit and profit of defendants and said directors, who voted for the same, and Brown Brothers & Company; that on October 19, 1904 (the date of the shareholders' meeting) there were outstanding 172,613 shares of Transit Company stock; that at that time Transit Company owned of the common stock of the Railways Company a like number of shares and of its preferred stock 82,373 shares, the two amounts aggregating more than two-thirds of the stock of Railways Company; and that by a pretended vote of Transit Company shareholders on October 19, 1904, it was claimed that 163,000 shares

voted in favor of the scheme; that more than half the shares voted were in the name of and cast by Brown Brothers & Company, ratifying a sale to themselves; and 25,000 shares were cast by the directors of Transit Company and Railways Company, to ratify a sale to themselves—all of which votes were fraudulent and void; that there were only 8,000 valid votes cast to ratify the agreement, all the other votes being by parties who participated as Syndicate purchasers and whose votes were void; that the proceedings at the stockholders' meeting were null and void because fraudulent in voting money, benefits and profits into the pockets of those acting as directors and trustees and that the tripartite agreement, the approval of the same and the other agreements made in carrying out said sales were all *ultra vires,* in violation of the rights of stockholders in Transit Company and of the rights of the Transit Company as a stockholder in Railways Company, and were done fraudulently, deceitfully and secretly without disclosing their personal aims to shareholders of the two companies. It is next alleged that the purpose of the tripartite agreement was to fraudulently dispose of the property of Transit Company to defeat about $2,000,000 in claims against said company, to get its assets at an unjustly low price and to procure the cancellation and surrender of the lease so as to close out all its assets and business; that by the united efforts of defendants (by reason of their conspiracy and fraudulent agreements, etc.), they have seized and disposed of $615,000 of cash in the treasury of Transit Company and $500,000 worth of supplies and have seized and held said railway tracks, powerhouses, etc., and have deprived Transit Company of its business without the consent of the owners of 9,000 shares in said Transit Company and without the consent of plaintiff who owns 198 shares of the par and actual value of $19,800 "or" (quoting) "of the persons who held

said stock before the plaintiff purchased the same in the market.''

The bill goes on to deal in an argumentative way with the situation, alleging that the interests of the defendant directors in the profits of the Syndicate exceeded their interest for the welfare of the stockholders of Transit Company; that over $15,000,000 of stocks, bonds and securities, not counting the value of the leasehold, present or prospective, were sacrificed for about the sum of $5,300,000; that the loss to Transit Company, if the scheme is carried through, would be $10,200,000, together with its capital stock and a prospective profit of $1,698,000 per year for thirty-four and one-half years.

It then charges that certain great profits were made by the defendants who participated in the Syndicate scheme and denounces the tripartite agreement provision for exchanging Transit stock for United Railways stock as illegal and void, which, plaintiff says, he ''rejects as unfair, unjust, unlawful and the whole scheme fraudulent, *ultra vires,* and contrary to the laws of the State of Missouri.'' That plaintiff filed his original petition on November 21, 1904, and two days later filed a *lis pendens* in the office of the recorder of deeds setting out the object and nature of the suit, the lien of plaintiff as a stockholder, etc., and that, at that time, none of the improvement bonds mentioned in the tripartite agreement had been issued; that, at that time, this plaintiff had not registered his stock in his own name on the books of Transit Company, but has since procured registration.

The scope of the relief prayed is sufficiently indicated in the excerpt given from the order of publication, reciting in plaintiff's own words the object and general nature of his suit.

Such was the bill and the relief sought.

The original petition was filed November 21, 1904, against certain defendants. In the February following

an amended petition was filed.    Thereupon certain other defendants were made parties who are brought in, and some already in were dismissed. In October, 1905, leave was granted to name ten additional parties defendant.    On May 23, 1906, a third amended petition was filed and an order of publication granted against the new defendants.

From the foregoing summary it is apparent that the life of the bill is the rescission of the tripartite agreement and the cancellation of all corporate acts in pursuance thereof, reinstating the lease of Transit Company, and to rehabilitate that corporation and put it on its feet as a going concern in possession of the assets and business it had on the date of that agreement.    To that end, plaintiff asked an auxiliary injunction, but, deeming the situation to be such that that kind of relief might not be equitable, plaintiff (in such event) wanted relief in the nature of damages by an accounting and restitution of profits.

No disposition of the demurrer can proceed justly without keeping in mind and giving effect to the following general observations on the bill:

*First.*    While no direct, yet there are inferential allegations showing plaintiff was not a shareholder in Transit Company at the time of the tripartite agreement or the shareholders' meeting.    Having no shares to protect he had no right to complain at that time. He bought his 198 shares thereafter "in the market." While the pleader alleges the par value and "actual" value to be $100 per share, yet he alleges no market value. · A market value of corporate stock (barring artificial manipulation by bulls and bears) is a factor of significance.    It may be taken as the consensus of opinion of the intelligent investing public of the stock's value, having in mind the condition of the corporate enterprise and the superior claims of creditors holding absolute or contingent claims, secured or unsecured. The bill is replete with allegations looking to prospec-

tive values and prospective profits on the assumption that the Transit Company would weather its present financial gale and have clear and prosperous sailing for the thirty-four years of its unexpired leasehold, for are we not told that "Hope springs eternal in the human breast" and that "Man never is but always to be blest." That line of allegations indicates that the "actual" value of the stock was based on such happy prognostications, and there is no hint in the bill that the market value at the time (or the price paid) was of much or any consequence. As the bill deals in a wealth of detail, we may assume that plaintiff was putting his best foot forward, hence if the market value had been considerable that detail would have appeared. Its absence means, we think, that the market value was small and that plaintiff invested in a speculative venture with eyes open to the difficulties of the situation.

*Second.* There is nothing in the bill showing that the stockholders' meeting was not properly advertised and fairly called. The seventh clause of section 1187, Revised Statutes 1899, requires that such stockholders' meeting be advertised in some newspaper or be given by written notice mailed to the last known address of each registered stockholder, twenty days before the meeting. The presumption is that such notice was not only given but complied with the law, absent an allegation to the contrary,

*Third.* There is no allegation that any protest was made at the stockholders' meeting by any shareholder or that a single adverse vote was cast against the tripartite scheme. True the bill alleges 9,000 shares did not consent; furthermore, that the persons who owned plaintiff's stock before his purchase in the market did not consent. But considering the particularity of the bill in other respects we cannot construe that allegation to mean that any of the non-consenting stockholders were present and actively opposed the

scheme. We think the "non-consent" mentioned in the bill must be construed a *voiceless* one, arising from indifference or other like cause.

*Fourth.* The bill is silent on material questions such as the state of the money market in September and October of 1904, and the credit and borrowing capacity of Transit Company at that time. It pleads the narration of the tripartite agreement to the effect that Transit Company was unable to pay the vast sum of money to become due shortly in November and the vast floating debt then due. That agreement narrates that all the securities of Transit Company were pledged to secure the approaching November payment and $8,000,000 in bonds, that its leasehold was also pledged to secure those bonds. That there was no way to pay its debts, except these securities be released from pledge and sold. The bill does not deny the truth of those narrations, amounting to present insolvency for practical purposes. It seems to ignore them. Furthermore, the pleader, as if to give point to its money embarrassment, alleges $2,000,000 additional claims outstanding against Transit Company, presumably (since that character of claims was not assumed by Railways Company) for damages accruing to individuals. No suggestion is made that the borrowing capacity of Transit Company, in the state of the money market, was equal to tiding over the trouble. No practicable way out of its straits is suggested. In spite, then, of the fair-weather prognostications pleaded as to the future career of Transit Company, arising from its great investment in its leasehold and the extent of its carrier business and plant, we must still read the necessary inference between the lines of the bill that Transit Company was in a present desperate financial fix, needing a heroic remedy—and that presently. If such remedy was practicable, otherwise than by a sale of its securities for what they would fetch, and the holders of the 9,000 non-consenting shares neglected

to attend the shareholders' meeting and point it out, or put their shoulders to the wheel or lift their voice against the tripartite agreement, they were neither diligent, useful or wise.

*Fifth.* Enough is alleged in the bill to show that the passenger carrying trade of the great city of St. Louis was in the keeping and hands of Transit Company. It was, then, a public-service corporation in the most precise and exacting sense. In this view, it owed duties to the general public which it could not breach except under penalty of ouster from its franchise. So the general public had a vital interest that the street railway service of St. Louis should be well performed without intermission by a corporation both willing and able to respond to its public duties to the uttermost.

*Sixth.* A person who buys shares of stock in a corporation holds such shares not independent of bondholders and fellow shareholders. The rights of shareholders *inter se* are so correlative and interdependent that a shareholder may not proceed by a suit in equity in a corporate matter involving rescission and injunction regardless of the interests of innocent investors in stock or bonds or bona fide creditors. In this view, there are no allegations in the bill that plaintiff is the only innocent shareholder. There are no allegations that all the shareholders participated in the alleged wrongful confederation and no allegation that the investors in bonds and the creditors of Transit Company all conspired to ruin the corporate enterprise. True the conspirators are alleged to have voted great blocks of stock, but it is not alleged they were the owners of all that stock. The case then must proceed on the theory that the interest of other shareholders and the rights of bondholders and creditors are to be considered before a writ of injunction issue or before an established corporate status is ripped up by rescission. Plaintiff commenced this suit as a stockholder in his

own behalf and on behalf of other stockholders who
might join. A year and a half went by before the
third amended bill was filed and no other stockholder
joined. Such coyness is tantamount to a refusal. A
necessary implication is the same as an allegation.
It is fair to assume then that his hand is against all
the other stockholders and all investors in bonds and
their hands against him. We shall assume there are
many other innocent but contented persons interested
as shareholders and bondholders whose rights must not
be ignored in granting a form of relief vitally affecting
them as well as plaintiff. Plaintiff is a newcomer. If
he have equities, their equities are older than his. What
say the maxims? "The elder equity is the better."
"Equity assists no person to the injury of another."

*Seventh.* While the language of the pleader is
guarded, yet enough appears to show that the tripar-
tite agreement is a fact accomplished. The lease has
been surrendered. Railways Company is in possession
of its original properties for eighteen months before
the third amended bill was filed and is proceeding
with its business as a common carrier of passengers
as a public-service corporation. The bonds, stocks and
mortgages have been readjusted to a new alignment.
At least those creditors within the purview of the tri-
partite agreement presumably have been paid. Pre-
sumably, too, new ones exist. And Transit Company
has become, to adopt the words of the bill, a "helpless
shell." In such condition of things there is no allega-
tion showing it possible to recreate the *status quo ante*
or that Transit Company is able to restore the vast sum
of money paid, or what it received even from those
bondholders, shareholders and creditors who acted in
good faith. In fine, Transit Company (as to the some-
time soul of it) is a dead coal and no chancellor hath
power to breathe a spark of life into it. No judicial
worker, however cunningly and patiently he wrought,

could rehabilitate it, put it in its original position and change it from a curious reminiscence into a going public service corporation subserving its full and beneficent original corporate purpose.

Assuming the foregoing observations just and pertinent on this record, we rule:

(a) That an injunction ought not to issue on the allegations of this bill. Says Chancellor KENT (Attorney-General v. Utica Ins. Co., 2 Johns. Chan. l. c. 378): "Nor ought the process of injunction to be applied, but with the utmost caution. It is the strong arm of the court, and to render its operation benign and useful, it must be exercised with great discretion, and when *necessity* requires it." "A court of equity . . . is never active in relief against conscience *or public convenience.*" [Lord CAMDEN in Smith v. Clay, see 3 Brown's Chan. R., note *p. 640.] Now, "conscience," as the term is used in equity, is not the mere caprice of the individual chancellor, as if equity was measured out in each case by such varying measuring rod as "the length of the chancellor's foot," but is administered by fixed principles. It is a precept that legal conscience is founded upon the law and never contravenes it. It is fundamental that "an action is of right, and that an injunction is of grace" (GIBSON, C. J., in Mayor v. Comrs., 7 Barr l. c. 366). Equity requires in such proceeding as this that the chancellor "balance the inconveniences likely to be incurred by the respective parties, by means of the action of the court, and grant the injunction, or withhold it, according to a sound discretion" (Gray v. Railroad, 1 Pa. St. l. c. 413), and, in a case of public service corporations, it is self-evident that the public convenience and public mischief may mark the distinction between sound and unsound discretion in granting an injunction on the facts pleaded. Said the vice-chancellor (Wood v. Sutcliffe, 8 Eng. L. & E. l. c. 219), speaking to a point somewhat apposite here: "I say as a general rule and principle,

because it must not be forgotten, that of necessity, whenever a court of equity is asked for an injunction in cases of this nature, or at all resembling this, it must have regard not only to the dry strict rights of the plaintiff and defendant, but must have regard to the surrounding circumstances—to the rights and interests of other persons which may be more or less involved in it.''

In considering the demurrer to the third amended bill we may take no note of the allegations of abandoned bills. They are unknown to us and neither break nor mend this bill. The amended bill being evidently framed on the theory that the tripartite agreement has been executed and that the things complained of are past events, it is not clear that the remedy by injunction should go, even if we overlooked the manifest injury to others interested—an injury disproportionate to the benefits accruing to plaintiff under the application of just principles of equity.

Therefore, as a bill for injunctive relief, there was no error in sustaining the demurrer.

(b) Nor was there error in ruling on that demurrer from the viewpoint of a bill for rescission. Specific performance and rescission are not wholly reciprocal remedies, but it may be safely said that rescission is the converse of specific performance and that cancellation is a mere auxiliary to make rescission effectual. It is clear that rescission looks to restoring the *status quo;* in rescission payments made and benefits conferred must be returned. Now, as already said, allegations of this bill are of such sort as preclude the practicability or even possibility of such restoration. As specific performance is somewhat of grace, the reciprocal remedy of rescission is also administered by the exercise of a just and sound discretion, precisely as is injunction. What we have just said on the injunctive features of the bill applies here. Learned counsel for plaintiff has furnished us with a brief pre-

pared with elaborate diligence, but we need go no farther than to a late case in our own court, Tanner v. Ry. Co., 180 Mo. 1. That case was In Banc. It was brought by some of the stockholders of the Lindell Railway Company, whose properties had been absorbed by the United Railways Company in an ambitious scheme of consolidation. The United Railways Company had then leased its consolidated property to the Transit Company. Tanner and others as stockholders in the Lindell Railway Company, brought a suit to rescind each and every of the agreements, leases, deeds and corporate acts having for their capsheaf the lease of the United Railways Company to Transit Railway, alleging conspiracy, confederation, fraud, illegality, etc., with vituperative epithets, as grounds for rescission. We see no material distinction between the allegations of the bill in the case at bar and the allegations of the Tanner bill.

On the authority of that case, therefore, we rule that the bill in the case at bar does not state facts sufficient to constitute a cause of action in equity for rescission. It is not necessary to restate the reasoning there employed; for that case must be taken and considered with this. It is authority for the propositions that where minority stockholders do not consent to a sale of the corporate properties, and the sale has already gone into effect, rescission will not be decreed where it will be productive of more injury than would result from a refusal of it, or where the asking stockholder stands by until the rights of strangers not parties to the suit and the public generally have attached; that when a person becomes the owner of shares in a corporation his right to the equitable relief of rescission of corporate sale is modified by the fact that he holds small portion of the stock, and if such stockholder has an adequate remedy by a suit at law for his injuries from wrongful conduct whereby his stock is converted or its market value taken from him, the

powers of an equity court will not be set in motion to work a rescission.

(c) As under the scheme of the bill the right to an accounting depends upon the right to a rescission and goes as a remedy to rehabilitate and build up the corporation pulled down, it would seem that with the denial of rescission the right of a shareholder to an accounting for the stocks and bonds of Transit Company alleged to be wrongfully converted falls. Clearly plaintiff may not repudiate the sale and yet take under the sale. He may not run with the hares and hold with the hounds. He may not sue in the name of Transit Company and get relief to which Transit Company in equity was not entitled. It goes without saying, that the case made by the bill relates to shareholders, not creditors or the holders of claims against Transit Company, and what we say has like limitations.

It may be that the silence of the former owner of the stock plaintiff now holds did not show consent to the scheme for an exchange of stocks as provided in the tripartite agreement and that plaintiff was not obliged to take his *pro rata* share of United Railways stock in exchange for his Transit stock—it may be that plaintiff's stock had a market value and that what was done amounted to a wrongful conversion of the value of his stock. Under such conditions he is not without his adequate remedy at law for damages, as pointed out in the Tanner case. We think the disposition of the demurrer well enough. In this view of it, the challenge to the bill for multifariousness, though serious, is not reached.

III. There is left one other assignment of error, *viz.*, in quashing the order of publication. But it is apparent that if the demurrer to the bill was well taken, as we have just held, then the ruling on the motion to quash the order of publication is no longer a live question. Certain it is that if those defendants in court

could not be kept in but were turned out because the bill was bad, the fact that other defendants were not brought in to be likewise (and straightway) turned out, is of no grave judicial concern. For why knit only to unravel, or plant only to uproot, or do with one hand only to undo with the other? We reserve the question until it comes up in a case breaking on the point.

The judgment is affirmed. All concur.