## J. B. JOHNSON et al. v. UNITED RAILWAYS COMPANY et al., Appellants.

In Banc, December 31, 1912.

1. **APPELLATE PRACTICE: Voluminous Briefs and Records.** Voluminous record and briefs, in cases in which appear seasoned and able counsel, trained in abstracting testimony and in condensing argumentation, recital and citation, are viewed with solicitude. Instead of helping, they hinder, a just disposition of the case. Appellate courts sorely need the discriminating pains of counsel to pick, choose and condense, clarifying what is dark and simplifying what is complex and avoiding excess of dilation, intricacy or extraneous coloring matter.

2. **JUDGMENT DEBTOR: Liability of Assignee of Lessee Debtor: In Actions at Law: Transit and United Railways Companies.** The question of whether on the mere face of the lease from the United Railways Company to the Transit Company the Railways Company was, as a matter of law, liable alone, or with the Transit Company, as joint tortfeasors, to persons negligently injured by the Transit Company in the operation of street cars, has been answered in the negative by the former adjudications of this court, and in this case is taken as foreclosed.

3. ———: ———: ———: ———: **Suit in Equity by Stockholder: By Judgment Creditor: Fraud.** In the former suits of Johnson v. Railways Co., 227 Mo. 423, and 243 Mo. 278, it was held that the forty-year lease from the United Railways Company to the Transit Company and the subsequent agreement by which the Transit Company transferred to the Railways Company all its cash, properties and contractual obligations, could not be rescinded and an accounting had on the prayer of a stockholder holding a few shares acquired after the transfer; that if such a stockholder were injured he must go to law, not to equity, for his damages; but it was not held in those, or any other cases, that a judgment creditor against the Transit Company could not, in equity, have those transactions opened up on the ground of fraud, and be permitted to show that the assets of the Transit Company passed into the coffers of the Railways Company under such circumstances that equity should subject the Railways Company to the payments of judgments on claims existing against the Transit Company at the time the transfer was made, to the extent of the value of such assets. That question is decided in the affirmative in this case. [Following Barrie v. Railways Co., 138 Mo. App. 557.]

4. **EQUITY: Attorney's Fees: Liability of Intervenors for Labor of Which They Had Benefit.** Where judgment creditors against one corporation agreed with their attorney upon a percentage basis of compensation for services to be rendered in establishing by suit in equity those judgments against another corporation to which all the assets of the other had been transferred, and thereupon eleven other judgment creditors intervene in their own right and are made plaintiffs, and a general money judgment is rendered against the transferee company, adjudging it to pay all the judgments, the court properly overruled the attorney's motion for an allowance of attorney's fees, by way of a *pro rata* on the amounts the several intervening creditors recovered in the final judgment, whether that motion was filed before or after the decree, and although his labors were of great value to said intervenors. In such case the general rule applies that one litigant cannot be compelled to pay the attorney's fees of another, either at law or in equity.

5. ———: **Pleading: Fraudulent Transfer of Properties by Corporation: Contract In Haec Verba.** It is not necessary for the pleader in his bill having for its object to compel one corporation to pay judgments against another which transferred all its assets to it, to set forth *in haec verba* the agreement by which that was done. It is good pleading to plead its substance and intendment, and to set forth only the ultimate and substantive facts necessary to constitute his cause of action.

6. ———: ———: **Champerty.** Where the facts relied upon for the defense of champerty do not appear on the face of the pleading, but appear extrinsically and collaterally in oral testimony, they constitute new matter, and to be available as a defense the ultimate fact of champerty must be pleaded.

7. ———: **Champerty and Maintenance: Attorney's Compensation: Percentage.** The mere fact that the attorney for plaintiff in the equity case has a percentage contract with him, contingent on success, avails nothing to establish either champerty or maintenance. Such contracts are now permitted by express statute.

8. ———: **Maintenance: Fraud: Assignment of Right to Sue: Judgment.** An assignment of a right to file a bill of equity for fraud committed on the assignor is not maintenance or void if such right is merely incidental to the assignment of a subsisting substantial property. The assignee, for a valuable consideration, of a judgment against a corporation which has transferred all its property to another corporation, has the right to maintain a bill in equity against said transferee to uncover the fraud in such transfer and to compel the transferee to pay the judgment. The judgment is property, and its assignment carries with it whatever is necessary to enable the assignee to possess and enjoy that property.

9. ———: **Assignee: Right to Sue.** The statute (Sec. 2159, R. S. 1909) provides that "any action or other proceeding, which the plaintiff in any judgment might have thereon, may be maintained in the name of the assignee."

10. ———: **Fraudulent Transfer of Properties by Corporation: Stockholders as Defendants.** In a suit by a judgment creditor of the Transit Company to compel the United Railways Company, to which the Transit Company had transferred all its assets, the stockholders of the Transit Company are not necessary parties. The corporation being in court, the stockholders are affected, if at all, only vicariously.

11. ———: **Necessary Parties: Joint Tortfeasors: Syndicate Which Appropriated Funds of Corporation.** Each tortfeasor is liable for the entire debt due plaintiff. Where the plaintiff obtained judgment against the Transit Company and thereafter that company, before payment, transferred all its assets to the United Railways Company, and the judgment creditor sues the Railways Company to compel it to pay his judgment, alleging fraud in the transfer, it is not necessary to join as a party defendant a syndicate which wrongfully shared in the division of the spoils in wrecking the Transit Company and in rehabilitating the Railways Company. Each one of the three is liable to plaintiff for the amount of his judgment, if there is any liability at all.

12. ———: **Defect of Parties: Waiver.** If there is a defect of parties plaintiff or defendant appearing in a bill, it should be raised by demurrer. Answering over waives it. If such defect do not appear on the face of the bill, it becomes a matter of defense and should be raised by the answer; and failure to so raise it, removes it from consideration.

13. **FRAUD: Damages: Creditors' Bill.** Fraud must concur with damages to be actionable. Constructive or actual fraud without damages would not support a creditors' bill.

14. **CORPORATION: Liability of Stockholders.** Individual shareholders of paid-up shares of stock in a corporation are not personally liable in any form of action for corporate debts.

15. ———: ———: **Liability of Company.** While the shares of stock of individual shareholders are at no time subject to levy and seizure for the debts of the corporation, every form and kind and particle of its corporate property are subject to levy and sale to pay such debts.

16. ———: ———: **Wrongful Use of Voting Power.** While individual owners of shares of stock in a corporation hold it free to trade, swap, sell, transfer and vote at corporate elections, without let or hindrance of corporate creditors, they may not use their voting power as they please and without regard to the result of the vote. In pursuance of a scheme of concerted ac-

tion, individual shares may be so manipulated, massed and voted as to effectuate an inequitable and unfair transfer of corporate properties to another corporation and the exchange of the stock for shares in the vendee, whereby, although the assets of the vendor are dissipated, the value of the stock is shrewdly and effectually preserved, and creditors of the vendor greatly injured and defrauded. If such a voting manipulation of the stock results in the enrichment of the vendee, and the impoverishment of the vendor and to leave it no means to pay its creditors, equity affords a remedy against the vendee.

17. ———: Assets: Trust Fund for Creditors. The assets of a corporation, in the eyes of equity, are a trust fund in which creditors have a right superior to stockholders as such. Corporate debts must be paid before stockholders may share in the corpus of the corporate estate.

18. ———: Creditors: Relief. Whatever relief a creditor has against individuals he has against corporations. Equity can afford relief against a fraudulent transfer by a corporation of its assets to hinder and defraud its creditors, to the same extent it can give relief against such a conveyance by an individual to hinder and delay his creditors.

19. ———: Fraud: Close Relationship. Equity looks to substance, not form; and in the pursuit of fraud between corporations the same minute and astute search is allowed in the investigation that is permitted in the pursuit of fraud between individuals. In an investigation intended to lead up to the establishment of a fraudulent disposition by one corporation of its assets to another, to defeat creditors, the close relationship of stock holdings and in the personnel of officers and managers and the use of the same instrumentalities will be considered.

20. ———: Fraudulent Disposition of Assets: Rights of Judgment Creditors. Where a corporation stripped itself bare of property and all semblance of debt-paying disposition, by the transfer of its entire corporate assets to another corporation; the one controlled the other through its stock ownership; the directors, officers and managers of both were the same; the stockholders of the transferring vendor were greatly benefited and the transferee greatly profited by the transfer; the two companies were at bottom one person in their dealings with each other; and the infirmity of consideration passing from the transferring company to the transferee is illuminated by that gripping fact; and the gains to the transferee are widely disproportionate to what it paid out, the transfer will be held to be fraud in law as to the then judgment creditors of the transferring company, and the transferee will be compelled to pay such judgments. [VALLIANT, C. J., and WOODSON, J., dissent, in separate opinions.]

21. ———: ———: **Voluntary Divestment of Assets: Necessity.** The voluntary transfer by one corporation of all of its assets to another cannot be excused on the ground of necessity, where the claims of judgment creditors of the former are designedly ignored and other contract creditors are provided for, and no adequate ground for such discrimination appears.

22. ———: ———: ———: ———: **If Receiver Had Been Appointed.** Whether the creditors who own judgments against a corporation which voluntarily, without just consideration, transfers all its properties to another would have fared better had a receiver been appointed, and all its assets and liabilities been marshaled and its creditors of all kinds paid in whole or in part by a decree and sale under equitable rules, is purely speculative and wholly beside the case, in a suit by such judgment creditors, attacking such transfer for fraud, and asking that the transferee be compelled to pay their judgments.

Appeal from St. Louis City Circuit Court.—*Hon. W. B. Homer*, Judge.

AFFIRMED (*as modified*).

*Boyle & Priest* for appellants.

(1) The plaintiff in this case should be denied relief because this action is tainted with champerty and maintenance, and the plaintiff has not come into a court of equity with clean hands. Champerty and maintenance are now recognized as prevailing in this State, with the same force and vigor as in England under the common law. Breeden v. Insurance Co., 220 Mo. 327; 5 Am. & Eng. Ency. Law (2 Ed.), p. 815; Quigley v. Thompson, 53 Ind. 317. This lawsuit is the result of the efforts of the plaintiff and his attorney to intermeddle and stir up strife, and beget controversies in matters which are none of their business. It is champerty to buy a doubtful claim, or to instigate a person to litigate. The bare right to file a bill in equity for fraud practiced on an assignor, is not assignable. Wilson v. Railway, 120 Mo. 58. (2) This suit is fatally defective because Brown Brothers and Company are not made parties defendant, and they are directly affected by the decree. Plaintiff has left

out necessary and essential parties, and before he can go on with his present action and have the trust created by the tripartite agreement set aside, and declared a nullity, he must include the stockholders and Brown Brothers & Company in the cause, and the fact that Brown Brothers & Company are alleged to be non-residents does not change the rule.    Shields v. Barrow, 17 How. 130; Ware v. Hollins, 14 Md. 158; Snodgrass v. Andrews, 30 Miss. 172; Randolph v. Daily, 16 N. J. Eq. 313; Boyd v. Hoyt, 5 Paige (N. Y.), 65; Bank v. Yuengling, 58 Hun, 474.    (3) Plaintiff cannot recover because it is not shown from the evidence that defendant took the assets of Trasit Company without any or adequate consideration, or was guilty of any fraudulent conduct.    The personnel of the directors of the Transit Company and Railways Company was practically the same, but the capital stock of each company was owned by vastly different persons.    These companies were organized under the provisions of sec. 1187, R. S. 1899. They were granted express power to make contracts for the sale of their assets, which by a well-known rule of statutory construction, gave them the right to make contracts for the acquisition of such assets.    Moorshead v. Railways, 119 Mo. App. 558.    There was no statutory restriction upon this right to contract interdicting its exercise between corporations whose stockholders and managing officers were identical, and in the absence of any restriction, it would be judicial legislation for the courts to hold that such interdiction exists.    The State having authorized them to contract with each other, regardless of whether their creators and managers were composed of the same or different persons, thereafter the courts cannot annul their contracts because of the identity of their managing officers. Noyes on Incorporate Relations, p. 279; Warfield v. Canning Co., 78 Iowa, 66; Pullman Co. v. Railroad, 115 U. S. 587; Bank v. Iron Co., 97 Mo. 38.    The as-

sumption of the liabilities of one corporation by another is sufficient consideration to make a transfer of its assets valid, and especially is this so when the liabilities assumed largely exceed the assets. Benesch v. Insurance Co., 72 N. E. 674; Baker v. Harpster, 22 Pac. 415; Fernschild v. Vedder, 49 N. E. 151. The knowledge that a seller is insolvent will not affect the purchase if a full compensation is made by the buyer. Show Co. v. Prickett, 84 Mo. App. 94. The dealings between the two companies were always fair and equitable, and authorized by law. Alexander v. Williams, 14 Mo. App. 13; Kitchen v. Railroad, 69 Mo. 224.

*Marion C. Early* for intervenors; *A. R. & Howard Taylor, Albert E. Hausman, Earl M. Pirkey, Lon O. Hocker, William L. Bohnenkamp* and *William R. Gentry* of counsel.

(1) It being clearly established that there was a concurrent ownership and control at all times between appellant and the St. Louis Transit Company, it follows that they were utterly incapable of entering into a valid contract with each other. There could be no mutual assent—therefore, no binding agreement. The one is a mere shell for the other. Barrie v. Railways, 138 Mo. App. 557; Milford v. Water Co., 3 L. R. A. 122; Day v. Tel. Co., 66 Md. 354; Bank v. Trebein Co., 59 Ohio St. 316. (2) The assets of a corporation are impressed with a trust in favor of creditors, and no distribution can be made among stockholders until all debts and liabilities have been satisfied. Nor could the same men vote a "sale" to themselves of the assets of either company. Cotton Seed Oil Co. v. Refining Co., 108 La. 74; Berry v. Row, 168 Mo. 316; 2 Morawetz on Corp., 790. (3) When the directory and principal officers of two corporations are substantially identical, all transactions between them are prima facie fraudulent as to creditors. Such being admittedly true here, all attempted transactions

between appellant and Transit Company are prima facie fraudulent as to creditors. Barrie v. Railways, 138 Mo. App. 557; Noyes on Intercorporate Relations, sec. 124, pp. 194, 195; Farnum v. Railroad, 150 N. Y. 430; Railroad v. Evans, 66 Fed. 810; In re Pulp Co., 139 Fed. 546. (4) They cannot sell at a valuation fixed by themselves under such circumstances. Moson v. Pewabic Min. Co., 133 U. S. 50. (5) When one corporation acquires all the assets of another corporation, which it controls, issues its stock in exchange for the stock of the old company, and the old company ceases to be a going concern and the new company continues the business, the new company receives the assets of the old company, burdened by its liabilities. The effect of such transaction is to distribute the assets of the old company to the exclusion of creditors. This cannot be done. In the case at bar both companies were at all times controlled absolutely by the same owners and officers, and the property "taken over" was subject to the payment of all liabilities of Transit Company. Berthold v. Lumber Co., 91 Mo. App. 333; Furniture Co. v. Hall, 107 N. W. 117; Laws 1907. (6) Sec. 1187, R. S. 1899, never contemplated a destruction of the elementary principles of the law of contracts, nor to in any manner enlarge the powers or lessen the liabilities of street railway companies in dealings with their creditors. The statute has no application here.

*John A. Gilliam* for respondents.

(1) Gilliam's contracts have been approved both by the statutes and the decisions of the courts of Missouri. R. S. 1909, sec. 965; Wait v. Railway, 204 Mo. 491; Curtis v. Railway, 118 Mo. App. 341, 125 Mo. App. 369; Boyd v. Mercantile Co., 135 Mo. App. 115; Beagles v. Robertson, 135 Mo. App. 306; Taylor v. Transit Co., 198 Mo. 715; O'Connor v. Transit Co., 198 Mo. 622; Lipscomb v. Adams, 193 Mo. 530; Yonge

v. Transit Co., 109 Mo. App. 235. The transfer of the judgments seems to have been plain assignments, without any understanding or agreement that the original plaintiffs were to receive anything further for the judgments than the amount paid for the same at the time of their transfer. (a). The defenses of champerty and maintenance are not set up in the answer. Kelerher v. Henderson, 203 Mo. 498. Champerty or maintenance cannot be raised except where the contract made illegal by champerty or maintenance is an issue in the case on trial. Kelerher v. Henderson, 203 Mo. 515; Bent v. Priest, 86 Mo. 490; Pike v. Martindale, 91 Mo. 284; Euneau v. Rieger, 105 Mo. 682. The right of attorneys to contract for a contingent fee has been unquestioned in Missouri since 1877. Duke v. Harper, 66 Mo. 51. (b). An assignment by a judgment creditor of his rights under the judgment entitles the assignee to file a creditor's bill in his own name. Diamond v. Rogers, 203 Ill. 464. The purchase of a final judgment is not the purchase of a litigious right. McMicken v. Perin, 59 U. S. 507; Bispham's Prin. of Equity (6 Ed.), sec. 166; Emmons v. Barton, 109 Cal. 662; 2 Am. & Eng. Ency. Law (2 Ed.), 1024; Lionberger v. Baker, 14 Mo. App. 353; Whitney v. Roberts, 22 Ill. 381. Judgment for tort is assignable. 17 Am. & Eng. Ency. Law 874; Moore v. Nowell, 94 N. C. 265; Charles v. Haskins, 11 Iowa, 329; Stewart v. Lea, 46 Atl. (N. H.) 31. The absolute assignment of a judgment passes all the assignor's assignable rights therein to the assignee, and gives to the latter the right to use every remedy, lien or security available to the assignor as a means of enforcement or indemnity, unless expressly excepted or reserved in the transfer. 17 Am. & Eng. Ency Law (2 Ed.) 882; Schlieman v. Bowlin, 36 Minn. 198; Kimble v. Cummins, 3 Metc. (Ky.) 327; Brooks v. Sanders, 110 Ill. 453; Applegate v. Mason, 13 Ind. 78; Wilson v. Wilson, 3 Del. Ch. 183; R. S. 1899, secs. 3745 and

3748; R. S. 1909, secs. 2156-2159; Lionberger v. Baker, 14 Mo. App. 353, 88 Mo. 447; Burns v. Bangert, 16 Mo. App. 22; Bank v. Burkley, 68 Mo. App. 327; Benne v. Schnecko, 100 Mo. 250. (2) The fact that the principal debtor in a creditor's bill is a nonresident and cannot be served does not oust the jurisdiction of the court to decree against resident defendants such relief as may be proper as against them alone. State ex rel. v. Bradley, 193 Mo. 43; Manufacturing Co. v. Baldwin, 87 Fed. 785. Persons who have parted with their title to the land involved in a proceeding in aid of execution are not necessary parties thereto. Andrews v. Scott, 211 Ill. 612; Jackman v. Robinson, 64 Mo. 289. (a). The charge being that the St. Louis Transit Company's assets were fraudulently disposed of and the charge that its stockholders participated in it, they not being shown to have any present interest in or claim to the property sought to be recovered, are not proper parties. The Transit Company represents them. Bronson v. Railroad, 69 U. S. 283; Meyer v. Hotel Co., 163 Mo. 69. The United Railways Company equally represents its stockholders. We do not have to join all participants in the fraud as defendants. Gardner v. Manufacturing Co., 18 N. Y. Supp. 391; Sides v. Schaff, 93 Ala. 106; Blanc v. Mining Co., 95 Cal. 524; Walter v. Riehl, 38 Md. 220; Boma v. Meano, 37 S. C. 520, 34 Am. St. Rep. 772; Wilson v. Spear, 68 Vt. 145; Herzog v. Weiler, 24 W. Va. 199; Williams v. Spragins, 102 Ala. 430; United States v. Latter Day Saints, 5 Utah, 538. The plaintiff is only compelled to join those in whom the legal title rests or those who have a beneficial interest to be affected. Taylor v. Webb, 54 Miss. 36; Constable v. Weser, 8 Ohio Dec. 247; Siemers v. Kleeburg, 56 Mo. 196. (b). If the claim is made that others are necessary parties, there must be a pleading that those parties are jointly liable and are living and within the jurisdiction of the court. Merrill v. Coggill, 12 N. H. 104; Fur-

bish v. Robertson, 67 Me. 38; Lefferts v. Silsby, 54
How. Prac. (N. Y.) 193; Levi v. Haverstick, 51 Ind.
236; Carico v. Moore, 4 Ind. App. 20; Goodhue v. Luce,
82 Me. 224; Holt v. Streeter, 74 Hun, 538; Palmer v.
Field, 76 Hun, 229; State ex rel. v. Evans, 176 Mo.
324; Gardner v. Fisher, 87 Ind. 369; Dewey v. State,
91 Ind. 173. (c). If a defect of parties appears on
the face of the petition it can only be raised by demur-
rer, or by answer when it does not so appear. Russell
v. Defrance, 39 Mo. 506; Butler v. Lawson, 72 Mo.
227; Benne v. Schnecko, 100 Mo. 250. And such ob-
jection cannot be raised after pleading to the merits.
Gatzweiler v. Morgan, 46 Mo. 94; Paving Co. v.
Young, 94 Ill. App. 204; Van Stewart v. Miles, 105
Mo. App. 242; Holliday v. Jackson, 21 Mo. App. 660.
He must stand on his demurrer. If he answers over
he thereby waives the point, and cannot raise it again
in any manner. Haughey L. & U. Co. v. Joyce, 41
Mo. App. 564; Spillane v. Railroad, 111 Mo. 555; Stew-
art v. Gibson, 71 Mo. App. 232; Strauss v. Transit
Co., 102 Mo. App. 644; Higgins v. Railroad, 36 Mo.
431. (3) There was inadequate consideration and a
fraudulent bargain. It is a principle of equity that
none shall by the aid of a court of justice obtain the
fruits of an unlawful bargain. Russell v. DeGrand,
15 Mass. 35; Gibbs v. Gas Co., 130 U. S. 396; Davis
v. Gemmell, 73 Md. 543. No principle is better settled,
or more equitable, than that the assets of a corpora-
tion are a "trust fund" for the payment of its debts
vested in the hands of the directors to be preserved
by them to secure the creditors of the corporation.
The corporate debts must be paid before there can
be a distribution of its property, or any part of it, to
the stockholders, and equity will follow the property
into the hands of the stockholders or of a fraudulent
grantee and apply it, or its equivalent, to the pay-
ment of the corporate debts. Barrie v. United Rail-
ways, 125 Mo. App. 96. When a corporation is in-

debted, and particularly (as here) when it is insolvent, it cannot directly or indirectly distribute its assets among its stockholders, or allow stockholders to withdraw its assets, leaving its creditors unpaid. And, if this has been done, the stockholders may be compelled to repay what they have received. Clark & Marshall, 778; Hageman v. Railroad, 202 Mo. 249; Lead M. & S. Co. v. Reinhard, 114 Mo. 322; Heman v. Britton, 88 Mo. 549; Roan v. Winn, 93 Mo. 503; Railroad v. Howard, 7 Wall. 392; Railroad v. Evans, 66 Fed. 809; Trust Co. v. Railroad, 174 U. S. 674; Kohl v. Lilienthal, 81 Cal. 386; Crandall v. Lincoln, 52 Conn. 73; Bank v. Douglas, 1 McCray, 86; Vance v. Coal Co., 92 Tenn. 47; Grant v. Contract Co., 104 Ky. 781; Bank v. Sanitarium, 103 Ala. 358; Hill v. Gruel, 42 Ill. App. 411; Cook on Stock and Stockholders, 548. In no case, no matter by what circuitous route or intricate devising the result is arrived at, will the courts permit to stand as against the rights of a creditor any arrangement whereby a corporation is dissolved, leaving creditors unpaid and yet saving something for its stockholders. (4) Plaintiff by filing this suit as against the United Railways Company obtained a general lien upon all the assets of the St. Louis Transit Company which had passed into the hands of the United Railways Company and by his specific allegations in regard to the $3,000,000 preferred stock obtained a specific lien on that stock or its value if disposed of, for himself and all intervening creditors. Miller v. Sherry, 69 U. S. 237; Clapp v. Peterson, 104 Ill. 26; Jones v. Fayerweather, 46 N. J. Eq. 255; Edmeston v. Lyde, 1 Paige, 637; Insurance Co. v. Power, 3 Paige, 365; Weed v. Smull, 3 Sandf. Ch. 273; Douglass v. Huston, 6 Ohio 156; McKay v. Williams, 21 N. C. 398; McRary v. Fries, 57 N. C. 233. (5) If a transfer is made by a debtor in anticipation of or pending suit against him, this is a badge of fraud. 20 Cyc. 444, note 92; Mason

v. Perkins, 180 Mo. 708; McCollum v. Crain, 101 Mo. App. 527; Rogers v. Evans, 3 Ind. 574; Wright v. Brandis, 1 Ind. 336; Goshorn v. Snodgrass, 17 W. Va. 717; Cooke v. Cooke, 43 Md. 522. (6) The transfer of all or nearly all of his property by a debtor, especially when he is insolvent or greatly embarrassed financially, is a badge of fraud. 20 Cyc. 449, note 19; Benne v. Schnecko, 100 Mo. 250; Seger v. Thomas, 107 Mo. 635; Grocery Co. v. May, 78 Mo. App. 323. (7) Matters of common knowledge in the community in which the buyer lives are sufficient to put him upon inquiry in regard thereto. 20 Cyc. 483, note 72; Dent v. Pickens, 46 W. Va. 378; Hodges v. Coleman, 76 Ala. 103; Stephenson v Kilpatrick, 166 Mo. 262. This applies to suits pending against Transit Company. (8) Where, however, the effect of a particular transaction with a debtor is to hinder, delay or defraud creditors, the law infers or supplies the intent, although there may be no direct evidence of a corrupt or dishonorable motive, but on the contrary an actual honest but mistaken motive existed. The law interposes and declares that every man is presumed to intend the natural and necessary consequences of his acts; and the courts must presume the intention to exist, when the prohibited consequences must necessarily follow from the act, and will not listen to an argument against it. 20 Cyc. 462-463, note 3; Snyder v. Free, 114 Mo. 360; Seger v. Thomas, 107 Mo. 635; Payne v. Stanton, 59 Mo. 158; Potter v. McDowell, 31 Mo. 62. (9) A purchase made by one not a creditor is fraudulent and void as against creditors, where it is made with notice of the fraudulent intent of the seller, notwithstanding the fact that the buyer has paid an adequate consideration. 20 Cyc. 470-471, notes 21 and 22; Stewart v. Outhwaite, 141 Mo. 562; Garesche v. McDonald, 103 Mo. 1; Stone v. Spencer, 77 Mo. 356; Shelley v. Boothe, 73 Mo. 74; Johnson v. Sullivan, 23 Mo. 474; Findley v. Findley, 93 Mo. 493. Knowledge of an attorney is imputable

to his client. 20 Cyc. 487, note 3; Shiedler v. Fisher, 13 Colo. App. 106; Morrell v. Miller, 28 Ore. 354. (10) Fraud may be imputed to a grantee either by direct co-operation in the original design at the time of its concoction, or by constructive co-operation from notice of it, and carrying the design into operation. Magniac v. Thomson, 7 Pet. (U. S.) 348; Jackson v. Myers, 18 Johns. (N. Y.) 425; Eigenbrun v. Smith, 98 N. C. 207; Hathaway v. Brown, 18 Minn. 414; Causler v. Cobb, 77 N. C. 30; Burgert v. Borchert, 59 Mo. 80; Martin v. Estes, 132 Mo. 402; Alberger v. White, 117 Mo. 347; Kuykendall v. McDonald, 15 Mo. 416; Coal Co. v. Burnham, 52 Neb. 364; Johnson v. Whitwell, 7 Pick. (Mass.) 71; McDonald v. Hoover, 142 Mo. 484. (11) A conveyance or transfer, whether founded on a valuable and adequate consideration or not, if entered into by the parties thereto with the intent to hinder, delay or defraud creditors, is void as to them. 20 Cyc. 487-488; Murray v. Cason, 15 Mo. 378; Frankenthal v. Goldstein, 44 Mo. App. 189; Stewart v. Cabanne, 16 Mo. App. 517; McDonald v. Hoover, 142 Mo. 484; Tube Works Co. v. Ring R. & I. M. Co., 118 Mo. 365.

LAMM, J.—Equity. From an omnibus decree against them, defendants, Transit Company and Railways Company, appeal. Mr. Gilliam appeals from an order refusing him an allowance of an attorney's fee.

Shortly, the record shows that at a certain time Railways Company became owner of the street railways of St. Louis. The consolidation was born in 1899 of the efforts of two syndicates, headed by Maryland Trust Company, and Brown Brothers and Patrick Calhoun, respectively. Presently, for reasons left to be conjectured, the men who control Railways Company organize Transit Company. There were some new stockholders, more at one time than at another, but

the official and directorate power was the same in each, *mutatis mutandis*. The stockholding power in Rail-ways Company was held by Transit Company. These twin or allied companies were chartered to sit in the same corporate nest in a figurative sense; for, to all intents and purposes, the one (Transit Company) con-trolled the other through its stock ownership, as said. So, they were destined to perform the same or similar public functions. To that end, under this record, each had its finger in the other's affairs, they marked time or kept step together for each other's purposes until the voluntary death of one ostensibly parted them. At a stroke of the clock, Transit Company took over the cash and all other properties, together with the public duties and contractual obligations of Railways Company (barring its bare franchise to exist as a cor-poration) by a contract known as a forty-year lease. From thence on Transit Company is well designated by one of the chief witnesses as the "operating com-pany." After five years of Transit control—a control to be summed up (even in the sober language of judicial discourse) as picturesque, singular and stormy—Railways Company, at another stroke of the clock, in turn, takes over (together with its leased property, public duties and contractual obligations) the cash and all other assets of Transit Company in pursuance of a contract, known as the tripartite agree-ment. Thereby the forty-year lease is cancelled and it was intended, in final effect, that the debts of Tran-sit Company should be taken care of, except claims sounding in tort for personal injuries, amounting to a very great sum, then in suit or being pressed as a thorn in the side of Transit Company by such claim-ants.

(*Nota bene*: That there may be no question about the effect of what was done on this head, we copy a bit from appellants' brief, referring to the funds sup-plied by the agreement; that brief says: ". . . where-

by all the debts secured and unsecured, then admitted and recognized as existing, could be paid in full, only and excepting the claims for personal injuries urged by parties against Transit Company, the merits of which were denied.'' We will recur to this feature again.)

Thenceforward, on the performance of that agreement (which happened) Transit Company on the surface was bereft of all substance. · It became less than a dry shell, to-wit, a mere phrase or curious *reminiscence* and not a whit more. It had left to it neither debt-paying power, nor debt-paying disposition.

The instant suit is to test the validity of that transaction, as to such claimants, and the liability of Railways Company in equity to them for judgments rendered on such claims. To that end J. B. Johnson files his creditors' bill in the circuit court of the city of St. Louis against St. Louis Transit Company, United Railways Company, and National Bank of Commerce of St. Louis, whereby he seeks as assignee of two judgment creditors of Transit Company, on his own behalf and on that of bona fide creditors similarly situated (who might want to come in and be made parties plaintiff, sharing costs, etc.), to reach certain alleged equitable assets of Transit Company said to be in the hands of the bank and Railways Company by virtue of that transaction, or subject Railways Company to the payment of judgments against Transit Company. Thereupon a certain eleven of such judgment creditors intervene in their own right. Johnson and said intervenors, *passim,* will be called plaintiffs.

Such steps are taken that a decree went in favor of the bank, on one hand, and in favor of plaintiffs against Railways Company and Transit Company, on the other. As plaintiffs do not appeal, the bank drops out of the suit. The aggregate recovery, in the form of an omnibus personal judgment, is $63,833.91, distributed between plaintiffs, thus: In favor of John-

son on a certain Sellman judgment, $3629.23; in his favor on a certain Morgan judgment, $2689.18; and in favor of the other intervenors severally in sums making up said aggregate,—each drawing interest at six per cent.

At a certain time before judgment below Mr. Gilliam, attorney for Johnson, files a motion for an allowance of attorney's fees, either by way of a charge on the alleged fund discovered and recovered or by way of a *pro rata* on the amounts the several intervening creditors (not represented by him) may recover in the final result. On hearing, this motion is ruled against movent simultaneously with the main finding and decree, and Mr. Gilliam appeals.

Off and on evidence goes in for ten months, the trial beginning July 19, 1909, and ending May 12, 1910. In so drawn-out a hearing, with breathing spells thrown in, the evidence naturally took both a wide (and a very long) range. It now comes here in three paper books of over 1300 pages, which we have more than once read line by line. We are furnished eight several briefs comprising 330 pages, citing a vast swarm of cases, all of which have received the attention they deserve. We choose to not leave this subject without an observation or two, viz.: We eye with solicitude such exuberance of record and briefs where seasoned and able counsel, as here, are trained in abstracting testimony and in condensing argumentation, recital and citation. Appellate courts sorely need the discriminating pains of counsel to pick, choose and condense, clarifying what is dark and simplifying what is complex from either excess of dilation, intricacy or extraneous coloring matter—thereby helping instead of hindering the just disposition of causes. No case can well demand such discouraging redundancy of record and brief, unless counsel plant themselves on the paradoxical excuse of the old Greek

orator in like fix, viz.: that he had had no *time* to be brief.

We allow ourselves a further preliminary word by way of a bird's-eye view of what has been already determined in other suits on some phases of the general subject-matter of this litigation.

In Moorshead v. Railways Co., 119 Mo. App. 541, the question was whether the putative lease was in fact a *lease* or something else—i. e., whether it created the *de facto* relation of landlord and tenant, or some other contractual relation, such as principal to agent or partner to partner. Moorshead, a passenger, was injured by the negligence of the servants of Transit Company. She sued both companies, counting on the theory that their contractual or running arrangement, was that of partners, or that of principal and agent, and therefore both or either were liable to her in an action sounding in tort under the doctrine of *respondeat superior,* or the maxim, *Qui facit per alium facit per se.* That court held the document a lease springing the relation of landlord and tenant, and, hence, Railways Company as landlord was not liable, in the first instance, for the torts of Transit Company, its tenant. The case was certified here on a dissent. We held the same way. [203 Mo. 121.]

In Chlanda v. Transit Co., 213 Mo. 244, a vigorous effort was made to modify that holding without avail. It is said there (referring to the Moorshead case):

" . . . We were all of mind that the document in question was a lease to all intents and purposes, and, as such lease, was a good defense against liability of the lessor for torts of the lessee.

"Accordingly, absent allegations and evidence (as here) showing the lease was a contrivance for a fraudulent or wrongful purpose in fact or law, so that 'the covin doth suffocate the right,' it must be held that the United Railways Company did not remain liable

to those suffering personal injuries from the negligence of the employees of the Transit Company.''

The same point, up in Westervelt v. Transit Co., 222 Mo. 1. c. 331,. was ruled as in the Moorshead and Chlanda cases. It was again considered with like result in Graefe v. Transit Co., 224 Mo. 1. c. 250, et seq.

All these cases were strictly at law, with no charge of actual or constructive fraud, and rode off on the construction of the lease contract by its four corners, read in the light of certain pertinent statutes and ordinances.

In view of the result in those cases, the question whether on the mere face of that writing Railways Company was, as a matter of law, liable alone, or with Transit Company, as a joint tortfeasor, to persons negligently injured by Transit Company in operating cars, has been answered in the negative, and must be taken as foreclosed for all the purposes of this case.

It will clear up the situation a bit more to point out that the transactions in hand have been judicially approached from another angle thus: Johnson v. Railways Co. et al., 227 Mo. 423, was in equity. There an attack was made by a tardy and small stockholder of Transit Company on the tripartite agreement. The lease was again under review and an attempt made, *ex industria,* to rip up said agreement, the cancellation of the lease, and (for the benefit of stockholders) to rehabilitate Transit Company, by returning to it assets said to have been unfairly stripped from it— plaintiff asking three forms of relief, rescission, injunction and an accounting. The case rode off on demurrer to the bill below and above. Here we ruled that, under allegations made, rescission would not go on the prayer of a stockholder holding a few shares, acquired after the event; that if such an one was injured, he must go to law, not to equity, for his damages. It was guardedly pointed out, however (p. 453), as follows: ''It goes without saying, that the case

made by the bill relates to shareholders, not creditors or the holders of claims against Transit Company, and what we say has like limitations.''

Not succeeding at first, the same plaintiff gave heed to the adage and tried, tried again by bringing a new suit. Still suing as the owner of a few shares of stock, bought in the market after the event, he filed another bill on substantially the same averments, omitting to ask rescission and injunction, but standing alone on an alleged right to an accounting. Again cast below on demurrer, the case reached us on appeal. In an opinion handed down in May of this year, and reported in 243 Mo. 278, we not only followed the first case, but further held that the judgment therein was *res adjudicata.*

From what goes before it appears that in the stockholders' suits nothing was held precluding recovery by a judgment creditor. Further, that when a creditor sues to open up, in a sense, the transaction evidenced by the tripartite agreement (as subsequently performed) and let in his judgment, he can only do so on the foot of fraud in fact or fraud in law; and that is precisely the theory of plaintiff's bill in the instant case, whereby he alleges, and at the trial undertakes to show, that assets of Transit Company passed into the coffers of Railways Company under such circumstances that equity should subject Railways Company to the payment of judgments on claims existing against Transit Company at the time, to the extent of the value of such assets.

At this point a question springs, to-wit: How much of the vast volume of this record shall be reproduced here, literally or by way of summary? The plan adopted at the outset was to make a rounded statement of all the record facts. But that plan was given over for reasons, to-wit: In Tanner v. Railroad, 180 Mo. 1; in Moorshead v. Railways Co., 203 Mo. 121; in the same case, 119 Mo. App. 541; in Johnson v.

Railways Co., 227 Mo. 423; in Barrie v. Transit Co., 119 Mo. App. 38; in the same case, 138 Mo. App. 557 (some in one case and some in another, *quod vide*) there may be found facts making up an epitome of the history of the origin and rise of some and the fall of other street railway corporations having to do with the subject-matter of this litigation and involved in this record. There may be found, also, in one or the other of those cases other facts held in judgment here, viz.: the terms of the lease (and release) between Railways Company and Transit Company, the terms of the tripartite agreement between them and a certain syndicate, the provisions of charters, mortgages (underlying and superimposed), deeds, collateral trust notes, trust agreements, indentures of trust and other indentures, underwriting agreements, syndicate agreements, *inter sese,* bonds of this or that kind, guaranties, voting trusts, pools of trustees and stockholders and participation receipts, etc., etc.—all of them intricate, many of them uncommonly rich in recital. There may be found, also, in one or the other of those cases elaborate *data,* now in this record, concerning the issues of stock, common and preferred, with a summary of the lists of stockholders at one time or another, the minutes of corporate and stockholders' meetings, excerpts from bookkeeping, circular letters and other correspondence, telegrams, book entries, statistics, promoters' prospectuses, estimates of gains, expenditures and losses, market quotations of stocks and bonds, statements of debts, statements of assets at one or another time, etc., etc.—all more or less involved, obscure and diffuse. Taken by and large, the foregoing facts picture the shade and mystery in which the operations of the modern railway or industrial corporation by way of financing and consolidations (corporate deglutitions) or separations (corporate regurgitations) with their attending manipulations and shifts of bonds, stocks and assets, are sometimes sup-

posed to grow and thrive or *vice versa*. No useful purpose could be furthered by gathering the details again together and weaving them anew into a connected statement.

Already the State of Missouri (willy nilly) has been put to expense to publish this matter in our law reports. Already the profession of the law (willy nilly) has been put to expense to buy that matter; therefore we shall not republish it, but refer the student in case law, prying and curious in that behalf, to those cases for the facts. We are no little persuaded to this view of it because in Barrie v. Railways Co., 138 Mo. App. 577, supra, the St. Louis Court of Appeals, with Judges REYNOLDS and GOODE sitting, held in judgment the essential facts and propositions of this case. True, there was testimony, taken in other cases, read into this by stipulation. Whether that testimony was also read into the Barrie case we do not know, but it matters little; for it was cumulative in tendency and the same may be said of the oral testimony given and documents read into the record in the case at bar and not appearing in the Barrie case. The principal and essential part of the present record is bodily taken from that in the Barrie case. True, too, in the Barrie case the petition made no allegation of fraud by name, but it made allegations of fact that were tantamount to fraud in law. The court so held and that holding was the pivot on which that case turned. [*Vide,* 138 Mo. App. l. c. 644, *et seq.*] In the instant case equivalent allegations are made, coupled with averments of actual fraud—i. e., in fact and intent. But the instant case does not hang only on the latter thread. Indeed, it would be a slender and precarious one compared to the other. Wherefore, we say again the substantial questions on the merits here, whether of law or fact, were held in judgment in the Barrie case. In substance, this appeal on the merits

is a challenge of the Barrie case and nothing more and we will proceed on that theory.

It will not be necessary to set forth the bill or intervening petitions; for the bill was sufficient, as will presently appear, to admit the proof; defendants answered by general denial, and the form of the intervening petitions is not challenged.

Stating them in our own way, questions here are three, to-wit:

(a)  Was Mr. Gilliam's motion for attorney's fees well ruled?

(b)  Did the bill state facts sufficient to constitute a cause of action (and herein of incidental questions of a defect in parties defendant and of champerty)?

(c)  Was the Barrie case well ruled?

Questions "*a*" and "*b*" are not in the Barrie case, hence will be determined, *in limine,* to clear the way for the merits.

I.  *Of the motion for attorney's fees.*

It is argued this motion was premature.  The main contention is that it was filed before, not at the foot of, the decree.  But, as the circuit court ruled the motion on its merits and appellants were not hurt thereby and could not appeal on that point, if we sustain their view it might open the matter for a new hearing, *nisi,* and a new appeal.  As to that we say. this case was advanced (we think now improvidently) on the request of both sides, and to the detriment of other cases on our general docket, to have vexed questions set at rest for the relief of courts said to be submerged by a flood of similar cases remaining for trial or pending on appeal in the court of appeals and awaiting the result.  To the end, then, that final disposition be made of the motion, we shall consider it on its merits.

There was testimony tending to show that Mr. Gilliam had a contract with his client for a percentage

of his recovery—that is, if his client's luck was ill, his own was *nil*—*contra,* if good, then his own took color and substance from that event. The intervening creditors were represented by independent counsel and (under our present Attorney's Lien Act, R. S. 1909, sec. 965) presumably had similar contracts. So that, without offense, we may refer to the homely allegory and sketch in Webster's old blue-backed spelling book, and say that the cases may be likened to a composite cow and each attorney drew milk from his own contractual udder. It appears sufficiently that the professional labors of Mr. Gilliam were many, arduous and long-continued in a wide field of exploration, both in realm of fact and realm of law; but it further appears that those labors were spread over related cases so allied in fact or law, on this or that point, to the instant case that it is impossible (and therefore pains lost) to attempt to separate the one from the other.

In effect, on one phase of the matter, there is a question sprung, we state in our own way, viz.: Who was the Christopher Columbus (or Jason), who, sailing on a dimly charted and vexed sea on a venture of discovery and gain, first sighted land (or the Golden Fleece) in the direction of this decree? Was he plaintiff's attorney in the Barrie case or Johnson's in this case? We put to one side an answer and with that answer the invidious task of apportioning professional honor or reward where there is enough for all.

Outside of cases hinging on our said Attorney's Lien Act, there are classes of cases in which attorney's fees are recoverable from the opposing party, or from a fund—*exempli gratia*: Where the suit is on a contract between parties litigant which provides incidentally for attorney's fees, stands upon a valid consideration and does not contravene any principle of law, such fees may be recovered as of course as per contract. So, where the cause of action is created by

a statute which provides for attorney's fees in suits brought under it, they go as of course as per statute. By our statute of partition attorney fees are allowed, and it has been held that equity will follow the law in that particular and allow them in cases of *equitable* partition. So, without express statute, by the usage of courts and on accepted reasoning, attorneys' fees are allowed in divorce suits and as part and parcel of the damages in suits on attachment bonds and in motions to assess damages on the dissolution of injunctions. So, they are recoverable when condemnation proceedings by corporations have been abandoned (North Mo. Railroad v. Reynal, 25 Mo. 534), and where a grantee has been put to expense in defending his title and sues his grantor on covenants of warranty, and in some cases in actions between principal and surety (State ex rel. v. Tittman, 134 Mo. l. c. 170 *et seq.*). In some other cases they are recoverable for services in malicious and fraudulent suits—this, under circumstances not clearly defined. (See observations and authorities in Albers v. Merchants' Exchange, 138 Mo. l. c. 159 *et seq.*). But not one of those cases, in fact or principle, is the case at bar.

With cases of that ilk eliminated, there is left to consider a doctrine of equity, viz.: that a trust fund of right should bear the expenses of its own adminisration. According to that rule it has been held that where a transaction has been ripped up or a conveyance set aside for fraud and an estate has been uncovered and recovered, which, in equity, belongs to creditors, and that estate is held in the hollow of the chancellor's hand to be administered and distributed, attorneys' fees may be allowed as part of the trust administration. [White v. University Land Company, 49 Mo. App. 450; Trustees v. Greenough, 105 U. S. 527; Central Railroad v. Pettus, 113 U. S. 116; Woodard v. Mastin, 106 Mo. l. c. 364-5.] Agreeable thereto

is an array of other cases industriously collated in Mr. Gilliam's brief *pro se*. But, it seems to us, their doctrine does not apply here. This because: The power of a court of equity is flexible enough to measure out relief in cases of this kind by a general personal judgment without segregating a fund in kind and bringing its corpus into a court of equity for administration. Accordingly, here the judgment was a general money judgment against Railways Company. It stopped short at that point. It administered no fund. It took this form apparently by consent of parties—at least no one took exception to that feature. In such fix, the case falls within the doctrine of the general rule, viz.: that in Missouri one litigant cannot be compelled to pay the attorneys' fees of another either in equity or at law. [Pickel v. Pickel, 243 Mo. 641.]

It appears that Johnson contracted that Mr. Gilliam, on top of a named percentage, might have all attorneys' fees the court allowed. That friendly turn added no virtue to movent's position. In that aspect it dealt with a bird (not in hand, but) in bush.

We hold the motion well ruled.

II.  *Of the sufficiency of the bill (and herein of some incidental questions referable to pleadings and bearing on the merits).*

(a) It is argued the bill is bad. Without reproducing it or analyzing its averments, we rule the general point against appellants. This because: The point appears in this court first in oral argument and in a reply brief filed after submission. It was made below, but abandoned in the brief in chief. Its belated and left-handed appearance on appeal is therefore in the nature of an *arriere pensee*. But, waiving that view and attending to the merits, the contention is found in two excerpts from appellants' reply brief,

to-wit: "It was necessary, therefore, for the pleader to set forth the contract" (the tripartite contract), "instead of his interpretation of its effect and meaning, so that the court may see whether the complainant's construction is justified by its terms." And again: "So there is in the petition no statement of facts which would constitute a fraud and no statement of values given or received at the time of the transaction of such a character as would, standing alone, imply fraud. Hence," etc.

As to the last proposition advanced, it will do to say we do not construe the petition as do learned counsel. They fall into error in that regard. We so rule and let it go at that. As to the first we say that according to the technique of the science of pleading it was not necessary for the pleader to set forth the tripartite or any other contract *in haec verba* in his bill. [Anderson v. Gaines, 156 Mo. 664; Estes v. Shoe Co., 155 Mo. l. c. 583.] That course is frequently taken, but, however tolerated as a traveled road, it is none the less *extra viam*. It was good pleading to plead them by their substance and intendment. A pleader, taking his chances on a failure of proof, may well content himself with setting forth only the ultimate and substantive facts necessary to constitute his cause of action. [R. S. 1909, sec. 1813.] He need not state his evidence or discover it. [*Ibid*, sec. 1818.] And in construing his pleading for the purpose of determining its effect, the judicial function is to construe its allegations liberally with a view to substantial justice between the parties. The lawmaker has so written it down (*Ibid*, sec. 1831), and what he says in that respect stands on its own reason.

Measured by those statutory rules, the principal petition was well enough; and, as already said, the intervening petitions are not challenged.

(b) *As to champerty and maintenance.*

It is contended that those vices exist here under this record. The contention does not reach the intervening petitions, but is leveled alone at Johnson's. If we do not miss the run of the argument it takes on a dual aspect—somewhat by way of an attack on the bill, possibly, and then as a defense on the merits.

(1) As to the bill itself, there is nothing in its verbiage or averments savoring of champerty, or maintenance. The assignments of the judgments are well alleged; hence, as a pleading, it is not open to the objection urged.

(2) Further, on the pleadings and merits, we rule the point against appellants, because:

-    In the first place there is no issue joined on champerty or maintenance. Appellants' answers were plain general denials. So, the facts relied upon for this defense do not appear either on the face of the pleadings or on any contracts introduced, but appear extrinsically and collaterally in oral testimony, if at all. They, therefore, constitute new matter. Hence, to save the point, the ultimate fact of champerty should have been alleged as a defense. [Kelerher v. Henderson, 203 Mo. l. c. 511, *et seq.*; Shohoney v. Railroad, 231 Mo. l. c. 141, and cases cited.]

In the next place, waiving for this turn, the foregoing view, there is no champerty or maintenance shown, as those vices are defined in the books. The bare fact that Mr. Gilliam has a percentage contract, contingent on success, avails nothing to the point; for such contracts are now permitted by express statute. [R. S. 1909, sec. 965, supra.] Thereto the Law accords with the Gospel. [Reynolds v. Clark County, 162 Mo. l. c. 684.] That statute, held constitutional, has been more than once construed and administered blandly to advance its ends. It evidences a public policy not to be ignored.

(3)  But appellants do not stop there.  Their contention goes deeper.  They invoke against Johnson the doctrine that a suitor in equity must come into court with clean hands.  They argue Johnson's hands are unclean.  That he is an officious intermedler to stir up strife and promote litigation—a sort of common scold as it were.  That he bought, through the assignment of his judgments, a bare litigious right to attack a transaction for fraud, *ergo*, is without the pale of equity.  Let us look to that.  The doctrine they appeal to is stated shortly but well by Bispham in his Principles of Equity (7 Ed.), p. 255, in this way:  "Thus, in equity a mere litigious right, the transfer of which would simply tend to encourage litigation, and thus fall within the spirit of the rule against maintenance, will not be recognized.  Therefore a bare right to file a bill in chancery on the ground of fraud cannot be assigned even in equity."  But mark the limitation of the rule:  "Where, however, an assignment is made of subsisting property," says that author, by way of context and limitation, "an incidental right to sue for a fraud will pass by the assignment."

Another standard authority (2 Am. and Eng. Ency. Law, 2 Ed., p. 1024) puts the doctrine of the rule and its qualification in a somewhat different form—a form approved by this court (Ryan v. Miller, 236 Mo. 1. c. 510), thus:

"The assignment of a mere right to file a bill in equity for fraud committed on the assignor is void as being against public policy and savoring of maintenance.

"*Qualification.*  But it seems that this rule, as established by the authorities, applies only to a case where the assignment does not carry anything which has itself a legal existence and value independent of the right to sue for a fraud.  It does not apply to a case where such right is merely incidental to a sub-

sisting substantial property which has been assigned, and which is itself intrinsically susceptible of legal enforcement. In such a case the assignee is entitled to maintain an action to set aside a fraudulent conveyance of the property assigned, if his assignor might have done so."

That formulation of the rule and its qualification is said in the Ryan-Miller case to be "buttressed by authority;" and a painstaking study of our own cases and those from other states, marshaled in briefs, sustains that view of it. In the Ryan-Miller case, Jones v. Babcock, 15 Mo. App. 149, is quoted from extensively as an acceptable pronouncement of the law. After stating the general doctrine, the Jones-Babcock case puts the limitation as follows: "Of course, the case is different where the assignment is of something in the nature of property. Here the assignee takes not only the thing assigned, but whatever is necessary to enable him to possess and enjoy the same. Thus, we have held that the assignment of a judgment enables the assignee to maintain a suit in equity against the judgment debtor to set aside a prior conveyance of property in fraud of his creditors."

Now, a judgment is property. No one would question that. So, under the facts there is no doubt about the assignment of the Sellmann and Morgan judgments to Johnson for a valid and substantial consideration. The proof runs only one way on that issue. Under such circumstances the general rule announced above does not apply, but its qualification controls, viz.: That the right to assignor's equitable remedies passed, as an incident to the judgments, to the assignee. It must be held, therefore, that by his assigned judgments Johnson got whatever right is necessary to enable him to possess and enjoy the same. *Incidentia rei tacite sequuntur.*

Agreeable to that view of it are our statutes: Revised Statutes 1909, section 2156 and section 2159; the

former providing for the assignment of judgments, and the latter reading: ''Any action or other proceeding, which the plaintiff in any judgment might have thereon, may be maintained in the name of the assignee.''

Agreeably to that view also runs the case law. In Lionberger v. Baker, 14 Mo. App. 353; and in the same case, 88 Mo. 447; and in Burns v. Bangert, 16 Mo. App. 22, the right of an assignee of a judgment to pursue the remedy sought in the instant case was sustained. Bank v. Bank, 107 Mo. 133, was a creditors' bill on an assigned judgment (p. 141) and the right to the remedy was not questioned. So, in Benne v. Schnecko, 100 Mo. l. c. 257. That idea further prospers, *arguendo,* on the accepted theory that the purchaser under an execution, though a stranger to the judgment, stands in the shoes of the judgment creditor as to all his equitable rights to set aside a fraudulent transaction in the way of the purchase. Agreeable thereto are many cases. We cite two as samples: Mason v. Perkins, 180 Mo. 702; Welch v. Mann, 193 Mo. 304.

The question up is not without difficulty; for the law thereon may still be in a fluid state and the last word not spoken. Cases may be found in our reports, as indicated in the Ryan-Miller case, where, in stating the general doctrine and ruling soundly on the concrete case, we have not always taken the precaution to state its qualification with precision and fullness. *Quandoque bonus dormitat Homerus.* I may mention one case of that kind, Weissenfels v. Cable, 208 Mo. 515, for it fell from my own pen.

The point is disallowed to appellants.

(c)  *Of defect of parties defendant.*

One of Sir Mathew Hale's rules for judicial discourse was: ''To speak in few words and home to the point.'' It may be applied here.

Something is said of the absence of stockholders of Transit Company as parties. But the corporation being in court, it results that so far as they are affected, if at all, it is vicariously only. The object of the suit is not to have satisfaction of them. The ultimate office of those allegations in the bill relating to stockholders was by way of prelude or as matter of inducement leading up to corporate acts denounced.

Something is said about the absence of Brown Brothers & Company as parties defendant. As to that we say: No relief is sought against them. If they as syndicate managers wrongfully shared in a division of the spoils in wrecking Transit Company and rehabilitating Railways Company, as alleged in this bill, they may or may not be liable. We have no concern with that liability in this case. If that syndicate was the conduit or agency through which part of the assets of Transit Company wrongfully came into the hands of Railways Company and were by it appropriated to its own use, Railways Company, when brought to book for its own gains in the transaction, cannot complain of the absence of Brown Brothers & Company as parties defendant; for we take it as a primer rule that if A has property and owes B, C and D, and in pursuance of a common scheme, as alleged in this bill, A disposes of it after such fashion that X, Y and Z wrongfully participate in his estate at one or another step in consummation of that common scheme, then B, C or D may sue Z without including X and Y in the suit. Among wrongdoers, every tub stands on its own bottom. It is against the policy of the law that a wrongdoer should benefit by the presence of coadjutors.

But there is a technical statutory rule equally fatal to appellants' point. Thus: If there be a defect in parties plaintiff or defendant appearing in a bill, it should be struck at by demurrer. Answering over, as here, waives it once for all. If such defect do not

appear on the face of the bill, it becomes matter of defense and should be struck at in the answer, or there is no life in it. As pointed out before, defendants answered by general denial only. By that course they also waived any defect of parties. [R. S. 1909, sec. 1800; *Ibid*, sec. 1804.]

All cases expounding those statutes so held—*ex. gr.*, Horstkotte v. Menier, 50 Mo. 158; Franke v. St. Louis, 110 Mo. 516; Crook v. Tull, 111 Mo. l. c. 288; Ashton v. Penfield, 233 Mo. l. c. 417; Bonsor v. Madison County, 204 Mo. l. c. 98; Scott-Force Hat Co. v. Hombs, 127 Mo. l. c. 399, *et seq.*

A disposition of the foregoing brings us to the final and main question, viz.:

III. *Was Barrie v. Railroad Co.,* 138 *Mo. App.* 557, *well ruled?*

We hold it was and adopt the opinion in that case, its statement of fact, its conclusions of law and its reasoning bodily as our own. It covers 130 pages of that report, and must be read with this, since its length forbids republication. We consider our judicial duty done when we adopt it without reprinting. It can speak for itself; for it exhausts the subject-matter. We leave it with some observations, viz.:

In its analysis, marshaling of fact and exposition of law, certain helpful and pertinent propositions should be kept in mind, namely:

*First*: Fraud must concur with damage to be actionable; hence constructive or actual fraud without damage would not support a creditor's bill.

The Barrie case does not fall under the ban of that principle, but is supported by it.

*Second*: Individual shareholders of paid-up shares of stock in a corporation are not personally liable in any form of action for corporate debts.

The Barrie case holds nothing contrary to that trite proposition.

*Third*: It follows, somewhat as a corollary to the last proposition, that the shares of stock of individual shareholders in Transit Company were at no time subject to levy and seizure for the debts of Transit Company. However, on the other hand, every form and particle of its corporate property, down to its last patch and shred, was subject to such levy and sale. Such sequestration of the corpus of the corporate estate by levy and sale would necessarily wipe out stock values; but it remains true that the stock, *as* stock, could not be reached directly or obliquely for corporate debts. It follows, also, that such stock was held by its owners, without let or hindrance of corporate creditors, free to trade, swap, dicker, sell, transfer and vote in corporate elections—the *jus disponendi* being of the essence of full ownership of any kind of property. So much must be conceded to appellants, subject to the qualification announced in the next proposition.

The Barrie case holds nothing to the contrary.

*Fourth*: But it does not follow from the last proposition that stockholders may use their voting power as they please and without question to the result of the vote. They (as all others) must reckon with the maxim, *Sic utere tuo ut alienum non laedas,* and square their acts therewith. It does not follow that in pursuance of a scheme of concerted action, individual shares of stock might not be so manipulated, massed and voted as to effectuate an inequitable and unfair transfer of Transit properties, to the ultimate end (as *one* fruit of the scheme) that thereafter such stock might be exchanged for stock in the vendee corporation, whereby its value might be shrewdly and effectually preserved to the original shareholder, after dissolution and dissipation of its assets. Such result, flowing from such inducing cause, injured creditors might bring to book in the courts of the land administering the law of the land. That is, it does not fol-

low that such plan taken from side to side and end to end, might not lead up to and produce a corporate action by stockholders which unjustly enriched the vendee corporation and unjustly impoverished the vendor corporation, thereby resulting in a grave wrong to those persons Transit Company may justly owe.

The Barrie case prospers on that theory—a theory not strange to the courts, as cited cases show.

*Fifth*: The assets of a corporation are, in the eye of equity, a trust fund in which creditors have a right superior to stockholders as such. · Corporate debts must be paid before shareholders may share, either in a straight line (as the bee flies) or in a round-about way (as the fox runs), in the corpus of the corporate estate.

The Barrie case accords with that view of it.

*Sixth*: It is self-evident that, speaking broadly, whatever relief a creditor has against A and B, individuals, he has against X and Y, corporate entities; for it would be a shame to equity if the discriminating and piercing eye of a chancellor, having "a passion for justice" (as Lord CAMPBELL says Lord HOLT had), or a "benevolent solicitude for the discovery of the truth" (as he says Lord CAMDEN had), was to be baffled by such a mere veil or screen as the shell of a corporate entity, so that while it could see a wrong in individuals it would blink the like in corporations. It can never be amiss to remind ourselves that in a court of conscience a corporation, like a natural person, is required to live up to the great commandment of the law, viz.: To live honestly, not to injure another, to give to each one his due. Such was the doctrine of old Ulpian, carried over into the Code of Justinian, and it is a very good rule of equity down to this very day. Corporations may libel, they may be guilty of malice and (though without souls, yet) they must be held to have an ethical sense, and know the

difference between right and wrong, between mine and thine—or suffer for it.

The Barrie case runs on that theory.

*Seventh*:   Equity looks to substance, not form, and in the pursuit of fraud between corporations the same minute and astute search (high or low, in every nook, crevice or cranny) is allowed in the investigation that is permitted in its pursuit between individuals.   In State ex inf. v. Standard Oil, 194 Mo. 124, certain statutes were in review denouncing a certain combination as "a conspiracy to defraud." The combination being put on the foot of a fraud by the statute, the question was as to the scope of the investigation.   In that case (p. 156) it was said:

"Yet, experience has shown that stock holdings showing a community of interest, while in some cases innocuous, might in given cases be the very root from which the trust agreement grows.   On principle, why may not this root be got at?   In an investigation intended to lead up to the establishment of a fraudulent conspiracy between individuals, taking for illustration a fraudulent disposition of property, it could not be denied that kinship or close business intimacy would be relevant matter, for what it was worth, be that worth much or little, and we can perceive no good reason why this investigation may not commence at the very ground-work of those corporations, showing, if fact it be, a close relationship in stock holdings and in the personnel of officers and agents, the use of the same instrumentalities and methods, simultaneous in time and originating in the same radiating center—a sort of prenatal, natal or else post-natal disposition to combine, as it were—to be followed, of course, by sufficient proof indicating that the community of stock interest, if any, had been used as a foundation upon which to build the illegal structure denounced by the statute.

"In cases where doubt exists, proof of motive may fill an office in the administration of law."

On the tenor and method of such investigation, see, further, Adriance v. Arnot, 31 Mo. 471; Hopkins v. Sievert, 58 Mo. 201; Massey v. Young, 73 Mo. l. c. 273-4; Black v. Epstein, 221 Mo. l. c. 310-314.

The Barrie case runs on all-fours with the foregoing.

*Eighth*: Barring a great strike in 1900, the evils befalling Transit Company seem to have sprung from the terms of its forty-year lease and were, in a sense, voluntarily suffered. That this is so appears from the following from one who spake for it as with authority. Referring to the situation, he says: "Of course, any one familiar with the organization of these two companies will at once realize that the Transit Company, through its ownership of stock, absolutely dominated the United Railways Company organization." As between it and Railways Company, it, through its stock ownership, as said, and through its board of directors and corporate officers (whose personnel was substantially the same) had power to control its huge outlays for the betterment of the leasehold estate, or, at any time, to take steps to readjust its contractual relations with Railways Company on a workable and equitable basis—if found unjustly oppressive, as they were. It did nothing of the kind. It attempted nothing of the kind. To the last moment it spent vast sums of money in swelling the estate of Railways Company, taking back pay for its outlays, made in solid cash, the depreciated securities of Railways Company at par. At times these were estimated as worth around fifty cents on the dollar or less in some instances. It laid miles of new track, built new power houses and made many other costly betterments which, we think, it had the option to make or not to make. Thus, it voluntarily filled the role of a market for the depreciated securities of Railways Company at par. If it had been pow-

erless to keep itself from those outlays, or temper them, or if its corporate nose had been held as by a vise to the grindstone of an oppressive and biting contract, with no power to modify, or which it had attemped to modify and failed, the case might assume a different aspect on what produced the crisis in its life.

Nothing in the Barrie case militates against that view of it.

*Ninth*: The tripartite agreement is amiably described, by one of the chief actors in its genesis, as a "loosening up process." The situation confronting Transit Company in October, 1904, sprung a corporate feeling told in the graphic phrase of one important witness (who knew all its ins and outs) in this way: ". . . it was . . . scared to death . . ."

It will be of judicial interest to note what significant results followed from that "scare" and that "loosening up process," viz.: Every one profited thereby except the miserable ones, who suffered the wrongs of negligent personal injuries at its hands. (*Note*: These wrongs are adjudicated and not open to question.) Every interested party seems to have been represented (in body or mind) in one step or other of the transaction except them. They were uninvited, unrepresented and conspicuous by their absence—unless the serene and omnipresent majesty of the law attended the affair as their guardian. The St. Louis Court of Appeals thought it did, and we are of that mind. Syndicate managers made vast gains; all Transit Company stockholders, who desired to come into the pool were allowed to participate in syndicate profits, and they made a very pretty penny by it; the debts of Transit Company, except as above, were taken care of dollar for dollar; Railways Company was benefited in vast amounts by relief from its bond guaranties, from the release of its lease, thereby taking over the leasehold estate enormously bettered and swollen

by the outlays of Transit Company and of great value; it got over $600,000 in cash from Transit Company, a great amount of other assets in supplies and, at the end, came out the owner of a great block of stock, once the property of Transit Company. So, it stepped into a business (a good will, or rather a monopoly of passenger carriage) that netted over a million dollars the last year it ran (a phenomenal year, it is true) and took over a plant of which its president boasted it was equipped so well it needed no extra expense for betterments for a considerable time. To crown all, as already said, the plan contemplated (and this was held out to Transit stockholders to toll them on to the corporate death of their company) that its old stockholders, by a *pro rata* exchange, would escape any appreciable loss by swapping their stock for the stock of Railways Company at the ratio of five for two. And that result was also attained, practically. All these things were the natural and intended results of the tripartite agreement and of the syndicate agreements at its foot, every one of which were interdependent and headed to the common and predestined purpose, so outlined and consummated.

It is not allowed to us, under this record, to hold that those contracts and results (as argued) were disconnected or independent of each other, so that Railways Company held the gains accruing to it by a clear and wholesome title acquired through third parties or by independent contracts. To the contrary these things were but links in a chain, a concatenation, and, keeping in mind the dangling prize hung out to Transit stockholders to save themselves, it was here, as in the nursery fable (if we may borrow from so humble a source without lowering the dignity of our case) to-wit: "the fire began to burn the stick, the stick began to beat the dog, the dog began to bite the pig, and so the pig jumped over the stile and the old woman got home that night."

The record shows that after Transit Company ceased to be a going concern, stripped itself bare of property and all semblance of debt-paying disposition, Railways Company adopted the policy, not because liable, it is said, but from grace, to shave down and settle such Transit claims for personal injuries as its distinguished counsel recommended. There can be no injustice, under the facts of this record, in a chancellor's requiring that to be done as of right what the corporation assumed to do as of grace and mercy. It is not meet and comely that the unfortunate should beg as a mercy for what is their due as of right.

The *rationale* of the Barrie case is in line with the foregoing.

*Tenth*: It is argued, in effect, that what was done was of *necessity*. As to that we say: One adage puts it that Necessity is the mother of invention—another, that Necessity knows no law. We have been diverted by them, but have no call to make use of either in determining the right of this case. It is sufficient to hold that whatever the play of necessity there was none calling for Railways Company's taking over all the properties of Transit Company and at the same time leaving those persons Transit Company had injured by its negligence in the lurch to whistle for compensation. It sufficiently appears that the solicitude and care for other creditors, had it been broadened and quickened a little, would have had a generous stomach for all. We stress the fact that the claims of parties injured by negligence were designedly ignored and no adequate cause appears for such discrimination.

The Barrie case prospers on that theory.

*Eleventh*: Whether claimants for damages for wrongs suffered would have fared better if Transit Company or its bondholders or its creditors, had applied to a chancellor for a receiver, had its properties preserved and finally administered by a court of

equity, its assets and liabilities marshaled and its creditors of all kinds paid in whole or part by a decree and sale under equitable rules, is beside the case and purely speculative. It is sufficient to say that (sitting as chancellors in what amounted to an equitable and domestic distribution of their assets), the plan adopted was not one known to equity jurisprudence and the result attained would have been impossible in a court of equity; for no court of equity should have wound up the affairs of Transit Company so that the stockholder, the promoter, the creditor by contract would have been protected while those who suffered damages from its torts were pushed to one side and left out in the cold.

*Twelfth*: Finally, putting to one side the heat of counsel (for surely equity knows no passion, except for justice), we conclude with this: In the Barrie case it is pointed out that there is such infirmity of consideration passing to Transit Company from Railways Company, such disproportionate gains accruing from the transaction as compared to what was paid out, and such legal wrongs arising from the gripping fact that the two corporations were at bottom one person in their dealings with each other, that equity, on recognized principles, will force restitution in the form of compensation to judgment creditors of Transit Company. Agreeable thereto are a line of soundly reasoned cases considered by the Court of Appeals in the Barrie case and to be found cited there, and others cited in briefs, and to be found in the headnotes of our reporter. Accordingly, under the doctrine of the Barrie case, we affirm this judgment.

It is so ordered. *Ferriss, Kennish* and *Brown, JJ.,* concur; *Valliant, C. J.,* and *Woodson, J.,* dissent in separate opinions; *Graves, J.,* dissents.

## DISSENTING OPINION.

VALLIANT, C. J.—I am unable to concur in affirming this judgment, and, as briefly as possible, I

will state my reasons. I am satisfied from the evidence that at the time the lease in question was surrendered, the Transit Company was insolvent and the lease was of no value.

The point is made that since each of these two corporations was in the hands of a board of directors that was composed of the same individuals who composed the board of directors of the other, the two corporations through their respective boards could make no contract with each other because, they say, individuals cannot deal with themselves, that there are no two minds to meet, but it is one mind dealing with itself. It is true the directors of one of these companies were the directors of the other, and to a considerable extent, though not entirely, the stockholders of one were the stockholders of the other. But if we should say that because of that fact any attempted contract between the two corporations was void, then we should have to say also that the lease was void to begin with. The United Railways Company had acquired by purchase several street railroads in St. Louis and their equipments, and the stockholders conceived the idea that they would organize another corporation to take the active management and operation of these railroads, and, to that end, grant to the corporation so to be organized a long lease of all the roads and their equipments. This was done, the stockholders in the United Railways Company taking the stock, or the most of it, in the new corporation, and on its organization electing for its directors the individuals who were the directors of the Railways Company. Then this lease was executed; the Transit Company took possession of the railroads and their equipments, together with a large amount of cash and bonds, and for several years operated the roads. Thus far it is not claimed that there was anything illegal in the transaction. A contract of that character is expressly authorized by the statute under which these two corpo-

rations were organized (sec. 1187, R. S. 1899), and it has been declared by this court that this is a lawful and valid contract. [Moorshead v. Railways, 203 Mo. 121.] If these two corporations with their intimate relation to each other could lawfully make this contract of lease it cannot be said that their intimate relation prevented them from contracting with each other to surrender the lease. The most that can be claimed by the plaintiff is that the intimate relation of the corporations to each other renders their dealings with each other liable to suspicion, calls for close scrutiny and throws the burden on the defendant to show that the transaction was free from fraud. But, if that burden was cast on the defendant I think the record shows that the defendant has borne it successfully. By the great preponderance of the evidence, as I read it, the defendant has shown that at the time of the surrender of the lease the Transit Company was insolvent and the lease was without value. It is true the witnesses testifying to that condition were interested, but no voice was raised to challenge their character as men worthy of belief. They are men of intelligence and large business experience and they were testifying in relation to a matter concerning which they had personal knowledge. If we should set aside their testimony now on the sole ground that they are interested, we would disregard our statute which enables a witness to testify notwithstanding his interest. I well know how apt the mind of a witness is to be influenced, even unconsciously, by his interest, and particularly so when he gives only his opinion. But these men were not merely giving their opinions, they were dealing with figures and facts within their knowledge. And we must either believe them or discredit them on the ground that their minds were so clouded by their interests that they did not know what they were talking about. There is nothing in

this record that would justify discrediting these witnesses.

The point is made that in estimating the indebtedness of the Transit Company at the time of the surrender of the lease the great amount of money borrowed by the company and expended by it in extending and improving the railroad and its equipment is taken into account and that the property is turned back to the lessor with those betterments. That is so, but in the contract surrendering the lease, the Railways Company assumes that debt. Besides, it was a debt for which the Transit Company alone was liable and one which it had the legal right to contract. Unless it could be shown that the debt was incurred and the betterments made with a fraudulent purpose the plaintiff has no right to complain of it. No such fraudulent purpose appears in this record.

In the brief of the leading counsel for respondent he gives the names of two witnesses as the only witnesses for the plaintiff on the value of the leasehold; these he puts forward as experienced and disinterested witnesses. One of these witnesses gives it as his opinion that the lease at the time of its surrender was worth $32,000,000, the other that it was worth from $3,000,000, to $4,000,000. The testimony of those two witnesses, considered together, leaves us lost in the wilderness, groping between $3,000,000, and $32,000,-000. If the estimate of either is even approximately correct that of the other is a wild guess. It is impossible that either of these two intelligent, honest and disinterested men could have entertained the opinion expressed by him if he was given reliable data on which to base an opinion. They are both plaintiff's witnesses, relied on by him and put forward as capable and reliable, and they are the witnesses whom the plaintiff asks the court to believe instead of the wit-

247 Mo.—24

nesses for the defendant against whom nothing can be said except that they are interested.

I think the judgment was for the wrong party and ought to be reversed.

## DISSENTING OPINION.

WOODSON, J.—My learned associate who wrote the opinion in this case, has in my opinion, misconceived certain portions of it, as appears from the evidence, which is practically undisputed, and practically all of which is in writing, and need not be here re-stated, since the substance of it has been fully and fairly stated by my associate and by the learned judge who wrote the opinion in the case of Barrie v. United Railways Company, 138 Mo. App. 557.

That misconception in my opinion, has caused my learned associate to give undue weight and prominence to certain facts and to unduly minimize the importance of certain other facts appearing in the record.

In a nutshell, the question here presented for determination, after being stripped of all verbiage and removed from the cobwebs spun about it, is this: Has a judgment creditor, in tort, the legal right to subject property, previously and legally mortgaged to a third party as security for the payment of a valid obligation, to the payment of said judgment, where the property is left in the possession of the mortgagor and lessee, and while there it constituted one of the instrumentalities by which the injury to the judgment creditor was inflicted?

In other words, where the owner of a farm, a residence or a business house or the owner of a manufacturing plant or a country or city newspaper, for instance, has leased said farm, house, manufacturing plant or newspaper to another, for a stated period, in consideration of certain covenants to improve and

repair and an agreement to pay certain monthly or annual rents for the use of the premises, and has taken back from the lessee a mortgage upon the leasehold estate, also upon all the income, issues and profits thereof, as security for the faithful performance of said covenants and for the prompt payment of said rents, and while said property is being so used according to terms of the lease by the lessee, a third party should be injured through the negligence of the former, has the injured party the right to subject to the payment of his damages the corpus of the property which belonged to the lessor, or the leasehold estate or the income, issues and profits thereof, which of course under the terms of the lease belonged to the lessee though covered by the mortgage to the payment of a judgment recovered by the injured party against the lessee, especially after the lease had been forfeited and the mortgage foreclosed, by assent or otherwise, and especially where the leasehold estate and all the income, issues and profits thereof were confessedly insufficient to pay off and discharge the debts and covenants secured by the mortgage?

Clearly not; nor do I apprehend that any lawyer of recognized ability, or a judge who is worthy of the ermine, would so contend for a moment.

Now there is, in my opinion, not one whit of difference in principle between that case and the case at bar.

Here the United Railways Company, a corporation, owned and operated certain street railways in the city of St. Louis with all the property necessarily incident thereto, and by virtue of and in pursuance of certain ordinances of said city, said United Railways Company leased all of its said roads and other property to the Transit Company, for a period of forty years, in consideration of certain covenants and agreements made and entered into by and between them, to improve and repair, and for an annual ren-

tal of five per cent upon the capital stock of the former company.

In order to secure the faithful performance of those covenants and the prompt payment of said rents, the Transit Company executed in due form a deed of trust to the United Railways Company conveying all of its leasehold interest in and to said roads and other property together with all the income, issues and profits thereof.

The Transit Company having become wholly unable to comply with the terms of the lease, and being unable to meet the payment of several millions of dollars of its indebtedness secured by said deed of trust, which would fall due and become payable in a short time, thus seeing bankruptcy and ruin staring it in the face, with no hope of relief in sight, with the concurrence and assent of the United Railways Company, the trustee in the deed of trust, and all parties interested thereunder, surrendered its lease and turned back to the United Railways Company all of said mortgaged roads and other properties, together with the income, issues and profits thereof, then on hand, all of which clearly was inadequate to pay the mortgage debts due the United Railways Company, much less the unsecured claims outstanding against it, such as those owned by the plaintiff and the intervenors.

There is no evidence of actual fraud in this case, and if I correctly understand counsel for plaintiff, no such contention is made by them, but their contention is that the facts of the case constitute a fraud in law upon the unsecured, rather all subsequent, creditors.

This contention is untenable and has no more foundation upon which to rest than had the claim of the injured party mentioned in the supposed case before stated.

In that case the owner and lessor of the farm,
upon the forfeiture of the lease, received back from
the lessee nothing more nor less than the leasehold
estate created by the lease, the same being the prop-
erty covered by the mortgage. And in the case at bar,
when the Transit Company, the lessee, was con-
fronted with the fact that it had several millions of
dollars of debts which would fall due shortly, with no
means with which to pay them, and no hope of pro-
curing any, it voluntarily did that which the lessor,
the United Railways Company, had the right to com-
pel it to do under the terms of the lease and mort-
gage, namely: to declare the lease forfeited and sell,
under the mortgage, all the interest of the Transit
Company in the leased property, namely, the fran-
chises, railroad tracks, cars, poles, wires, power-
houses, etc.; also to take possession of and use in the
payment of its debts all income, issues and profits
thereof earned by the Transit Company in pursuance
to the terms of the lease.

In other words, the United Railways Company
received nothing from the Transit Company except
what it had leased to the latter, and which the latter
had mortgaged back to the former.

If the opinion in this case correctly expounds the
law, then no mortgagee of property is secure in his
property rights therein, for the simple reason that
this case clearly holds that where the mortgagor or
lessee retains possession of the property, and while
using it, a third party is injured thereby in conjunc-
tion with the negligence of the mortgagor or lessee,
the mortgaged property may be subjected to the pay-
ment of a judgment secured by the injured party
against the mortgagor or lessee, notwithstanding the
fact that the mortgage antedates the injury. The
opinion is supported by neither law, reason nor prece-
dent.

In my judgment the opinion of my learned associate is not a correct enunciation of the law governing the facts of this case, and for that reason I respectfully dissent therefrom.

## ON MOTION TO MODIFY JUDGMENT.

PER CURIAM.—The second paragraph of the motion is stricken out.

As to the first paragraph of the motion suggesting that the judgment of the intervenor Moon has been reversed and cause remanded since the judgment of this court In Banc was rendered, it is ruled that the judgment of this court affirming the judgment of the circuit court be modified by eliminating the amount of the Moon judgment, $8794.58, and the interest, if any, calculated thereon up to the date of the rendition of the judgment below, and with this modification the judgment heretofore rendered by this court In Banc at this term remains in full force. Nothing herein to be to the prejudice of the Moon claim in pending suit.

The motion overruled.